## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

XIAOMI CORPORATION, et al.,

    *Plaintiffs*,

  v.

DEPARTMENT OF DEFENSE, et al.,

    *Defendants*.

Case No. 1:21-cv-00280-RC

## MEMORANDUM IN SUPPORT OF PLAINTIFFS'
## MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

STATEMENT OF FACTS .................................................................................................. 4

    A.    Xiaomi Is a Consumer Electronics Company with Extensive Ties to the United States. ................................................................................................ 4

    B.    Xiaomi Is Widely Held, Publicly Traded, and Ultimately Controlled by Its Founders.......................................................................................................... 6

    C.    The Department of Defense Designated Xiaomi a Communist Chinese Military Company (CCMC) In the Final Three Full Working Days of the Trump Administration, Without Notice or Explanation. .......................................... 9

        1.    Congress Provided for the Designation of Certain Entities as CCMCs Pursuant to a Statutory Process and Criteria................................. 9

        2.    Under an Executive Order Issued by President Trump, Transactions by U.S. Persons in the Securities of a Designated CCMC Are Restricted. .............................................................................. 10

        3.    After the Issuance of the Executive Order, and Only Three Working Days Before the End of the Trump Administration, the Department of Defense, Without Notice or Explanation, Designated Xiaomi a CCMC. ................................................................. 11

        4.    The Department of Defense's Designation of Xiaomi as a CCMC Is Causing and Will Continue to Cause Plaintiffs Irreparable Harm........ 12

    D.    Plaintiffs Sued to Invalidate the Unlawful Designation and Restrictions and Move for a Preliminary Injunction Before the March 15, 2021 Effective Date. ................................................................................................ 14

ARGUMENT ..................................................................................................................... 15

I.    Plaintiffs Are Likely to Succeed on the Merits of Their Claims That the Designation and Restrictions Are Unlawful and Unconstitutional.................................... 15

    A.    Plaintiffs Are Likely to Succeed on the Merits of Their Claim that the Designation Was Arbitrary, Capricious, and Contrary to Law in Violation of the APA. ................................................................................................... 16

        1.    The Department of Defense's Designation of Xiaomi as a CCMC under Section 1237 is Reviewable under the APA................................... 17

        2.    The Department of Defense Fails to Explain Its Decision. ..................... 18

        3.    The Department of Defense's Designation Is Not Supported by Substantial Evidence and Is Necessarily Contrary to Any Accurate Information Before the Agency. ............................................................. 21

B.    Plaintiffs Are Likely to Succeed on the Merits of Their Claim that the Designation Exceeded the Defense Department's Authority Under Section 1237 Because Xiaomi Does Not Meet The Criteria Required for Exercise of Such Authority.................................................................................... 22

C.    The Designation and Restrictions Violate Due Process, As Applied to Plaintiffs, Because the Government Did Not Provide Any Notice or Opportunity to Contest the Designation. ........................................................ 26

    1.    The Government Was Required to Provide Due Process When Designating Xiaomi as a CCMC and Applying the Restrictions.............. 27

    2.    The Designation and Restrictions Deprived Plaintiffs of Liberty and Property Interests Without Due Process Because They Did Not Afford Plaintiffs Any Notice or Opportunity to Be Heard. ..................... 28

    3.    Any Post-Deprivation Process Would Be Constitutionally Inadequate. ................................................................................ 31

D.    This Case Is Justiciable and Does Not Pose A Political Question....................... 33

II.    The Designation and Restriction Are Inflicting, and Will Continue to Inflict, Irreparable Harm on Plaintiffs. ........................................................................... 35

A.    The Designation and Restrictions Are Irreparably Harming Plaintiffs' Fifth Amendment Rights and Will Continue to Do So....................................... 35

B.    The Designation and Restrictions Are Irreparably Harming Xiaomi's Business and by Extension Its Shareholders Including the Individual Plaintiffs, and Will Continue to Do So. ................................................... 36

C.    The Designation and Restrictions Will Cause the Individual Plaintiffs to Suffer Irreparable Harm. ................................................................ 40

III.    The Balance of the Equities and the Public Interest Support A Preliminary Injunction. ........................................................................................ 41

CONCLUSION.................................................................................................... 43

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Aamer v. Obama,*
    742 F.3d 1023 (D.C. Cir. 2014) ............................................................................. 15

*Advance Am. v. FDIC,*
    No. 14-CV-953 (GK), 2017 WL 2672741 (D.D.C. Feb. 23, 2017) ....................... 36

*Aid Ass'n for Lutherans v. U.S. Postal Serv.,*
    321 F.3d 1166 (D.C. Cir. 2003) ............................................................................. 22

*Air Trans. Ass'n of Am., Inc. v. Export-Import Bank,*
    840 F. Supp. 2d 327 (D.D.C. 2012) ...................................................................... 39

*Armour & Co. v. Freeman,*
    304 F.2d 404 (D.C. Cir. 1962) ............................................................................... 38

*Armstrong v. Manzo,*
    380 U.S. 545 (1965) ............................................................................................... 26

*In re ATM Fee Antitrust Litig.,*
    686 F.3d 741 (9th Cir. 2012) ................................................................................. 24

*Bayer HealthCare, LLC v. U.S. Food & Drug Admin.,*
    942 F. Supp. 2d 17 (D.D.C. 2013) ........................................................................ 37

*Bd. of Regents of State Colleges v. Roth,*
    408 U.S. 564 (1972) ............................................................................................... 28

*Bennett v. Spear,*
    520 U.S. 154 (1997) ............................................................................................... 17

*Boddie v. Connecticut,*
    401 U.S. 371 (1971) ............................................................................................... 31

*CAIR v. Dep't of Justice,*
    264 F. Supp. 2d 14 (D.D.C. 2003) ........................................................................ 18

*Chai v. Dep't of State,*
    466 F.3d 125 (D.C. Cir. 2006) ............................................................................... 31

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
    401 U.S. 402 (1971) ............................................................................................... 18

*Cooper Indus., Ltd. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*,
876 F.3d 119 (5th Cir. 2017) ........................................................................... 23

*County of Los Angeles v. Shalala*,
192 F.3d 1005 (D.C. Cir. 1999) ....................................................................... 19

*Defs. of Wildlife v. Jewell*,
815 F.3d 1 (D.C. Cir. 2016) ............................................................................ 21

*Dickinson v. Zurko*,
527 U.S. 150 (1999) .................................................................................... 16, 21

*Dickson v. Sec'y of Def.*,
68 F.3d 1396 (D.C. Cir. 1995) ........................................................................ 20

*District of Columbia v. U.S. Dep't of Agric.*,
444 F. Supp. 3d 1 (D.D.C. 2020) ................................................................. 3, 40

*Elrod v. Burns*,
427 U.S. 347 (1976) ........................................................................................ 35

*Epsilon Elecs., Inc. v. Dep't of Treasury*,
857 F.3d 913 (D.C. Cir. 2017) .................................................................... 19, 20

*Feinerman v. Bernardi*,
558 F. Supp. 2d 36 (D.D.C. 2008) ............................................................. 39, 40

*Fuentes v. Shevin*,
407 U.S. 67 (1972) .......................................................................................... 31

*Gen. Elec. Co. v. Jackson*,
610 F.3d 110 (D.C. Cir. 2010) ........................................................................ 28

*Global Relief Found., Inc. v. O'Neill*,
315 F.3d 748 (7th Cir. 2002) .......................................................................... 32

*Goings v. Court Servs. & Offender Supervision Agency for D.C.*,
786 F. Supp. 2d 48 (D.D.C. 2011) .................................................................. 36

*Gordon v. Holder*,
721 F.3d 638 (D.C. Cir. 2013) ........................................................................ 42

*Pursuing Am.'s Greatness v. FEC*,
831 F.3d 500 (D.C. Cir. 2016) ........................................................................ 41

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
219 F. Supp. 2d 57 (D.D.C. 2002) .................................................................. 32

*Holy Land Found. for Relief & Dev. v. Ashcroft,*
    333 F.3d 156 (D.C. Cir. 2003) ...........................................................................17, 32

*Islamic Am. Relief Agency v. Gonzales,*
    477 F.3d 728 (D.C. Cir. 2007) .....................................................................................20

*John Doe Co. v. CFPB,*
    849 F.3d 1129 (D.C. Cir. 2017) ..................................................................................35

*Joumaa v. Mnuchin,*
    No. 17-CV-2780 (TJK), 2019 WL 1559453 (D.D.C. Apr. 10, 2019) ....................20

*Kadi v. Geithner,*
    42 F. Supp. 3d 1 (D.D.C. 2012) ..................................................................................20

*Kirwa v. Dep't of Def.,*
    285 F. Supp. 3d 257 (D.D.C. 2018) ............................................................................19

*League of Women Voters v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016) ........................................................................................42

*Marsh v. Or. Nat. Res. Council,*
    490 U.S. 360 (1989) ....................................................................................................16

*Massachusetts Lobstermen's Ass'n v. Ross,*
    349 F. Supp. 3d 48 (D.D.C. 2018) ..............................................................................23

*Mathews v. Eldridge,*
    424 U.S. 319 (1976) ....................................................................................................28

*Mey v. DIRECTV, LLC,*
    971 F.3d 284 (4th Cir. 2020) ......................................................................................25

*Meyer v. Nebraska,*
    262 U.S. 390 (1923) ....................................................................................................28

*Mills v. District of Columbia,*
    571 F.3d 1304 (D.C. Cir. 2009) ..................................................................................35

*Mittleman v. Postal Reg. Comm'n,*
    757 F.3d 300 (D.C. Cir. 2014) ....................................................................................22

*Morgan Stanley DW Inc. v. Rothe,*
    150 F. Supp. 2d 67 (D.D.C. 2001) ..............................................................................38

*\*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) .................................................................................16, 19, 20, 21

*Mullane v. Central Hanover Bank & Trust Co.*,
   339 U.S. 306 (1950)................................................................................29

*Mylan Pharm., Inc. v. Shalala*,
   81 F. Supp. 2d 30 (D.D.C. 2000)..........................................................37

*\*Nat'l Council of Resistance of Iran v. Dep't of State*,
   251 F.3d 192 (D.C. Cir. 2001)..................................................27, 28, 31

*Nat'l Fed'n of Fed. Empls. v. Weinberger*,
   818 F.2d 935 (D.C. Cir. 1987)................................................................18

*Nat'l Min. Ass'n v. Jackson*,
   768 F. Supp. 2d 34 (D.D.C. 2011).........................................................39

*Nixon v. United States*,
   506 U.S. 224 (1993)................................................................................34

*Nken v. Holder*,
   556 U.S. 418 (2009)................................................................................41

*Nw. Immigrant Rights Proj. v. U.S. Citizenship & Immigration Servs.*,
   No. 19-CV-3283 (RDM), 2020 WL 5995206 (D.D.C. Oct. 8, 2020)....................43

*OKKO Bus. PE v. Lew*,
   133 F. Supp. 3d 17 (D.D.C. 2015).........................................................20

*Olenga v. Gacki*,
   No. 19-CV-1135 (RDM), 2020 WL 7024206 (D.D.C. Nov. 30, 2020) ...........18, 20

*Parsons v. Dep't of Justice*,
   878 F.3d 162 (6th Cir. 2017) .................................................................17

*Paul v. Davis*,
   424 U.S. 693 (1976)..........................................................................27, 28

*People's Mojahedin Org. of Iran v. Dep't of State*,
   182 F.3d 17 (D.C. Cir. 1999).................................................................34

*People's Mojahedin Org. of Iran v. Dep't of State*,
   613 F.3d 220 (D.C. Cir. 2010)...............................................................31

*Physicians for Social Responsibility v. Wheeler*,
   956 F.3d 634 (D.C. Cir. 2020)...............................................................19

*Propert v. District of Columbia*,
   948 F.2d 1327 (D.C. Cir. 1991).............................................................30

vi

*Rakhimov v. Gacki*,
No. 19-CV-2554 (JEB), 2020 WL 1911561 (D.D.C. Apr. 20, 2020)....................................20

*Ralls Corp. v. CFIUS*,
758 F.3d 296 (D.C. Cir. 2014) ..................................................................... *passim*

*Reeve Aleutian Airways, Inc. v. United States*,
982 F.2d 594 (D.C. Cir. 1993) ...................................................................28

*Reid v. Covert*,
354 U.S. 1 (1957) ....................................................................................27

*Sandifer v. U.S. Steel Corp.*,
571 U.S. 220 (2014)...............................................................................23

*Satterfield v. Simon & Schuster, Inc.*,
569 F.3d 946 (9th Cir. 2009) ....................................................................26

*Save Jobs USA v. DHS*,
105 F. Supp. 3d 108 (D.D.C. 2015) ............................................................40

*SEC v. Chenery*,
318 U.S. 80 (1943)..................................................................................19

*Simms v. District of Columbia*,
872 F. Supp. 2d 90 (D.D.C. 2012) .............................................................36

*State of Washington v. U.S. Dep't of State*,
443 F. Supp. 3d 1245 (W.D. Wash. 2020)...................................................35

*Sulemane v. Mnuchin*,
No. CV 16-1822 (TJK), 2019 WL 77428 (D.D.C. Jan. 2, 2019)........................20

*Tex Tin Corp. v. EPA*,
935 F.2d 1321 (D.C. Cir. 1991) .................................................................20

*TikTok Inc. v. Trump*,
No. 1:20-CV-02658 (CJN), 2020 WL 5763634 (D.D.C. Sept. 27, 2020) ........37, 39

*TikTok Inc. v. Trump*,
No. 20-CV-2658 (CJN), 2020 WL 7233557 (D.D.C. Dec. 7, 2020)................17, 20

*Trifax Corp. v. District of Columbia*,
314 F.3d 641 (D.C. Cir. 2003) ..................................................................28

*Trudeau v. FTC*,
456 F.3d 178 (D.C. Cir. 2006) ..................................................................22

*Twichel v. MIC Gen. Ins. Corp.*,
   676 N.W.2d 616 (2004) ................................................................................................23

*United States v. E-Gold, Ltd.*,
   521 F.3d 411 (D.C. Cir. 2008) ......................................................................................31

*United States v. Verdugo-Urquidez*,
   494 U.S. 259 (1990) ......................................................................................................27

*United States v. W. Elec. Co.*,
   12 F.3d 225 (D.C. Cir. 1993) ........................................................................................25

*United Student Aid Funds v. Espinosa*,
   559 U.S. 260 (2010) ......................................................................................................29

*ViroPharma, Inc. v. Hamburg*,
   898 F. Supp. 2d 1 (D.D.C. 2012) ..................................................................................39

*Washington v. Reno*,
   35 F.3d 1093 (6th Cir. 1994) ........................................................................................42

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
   139 S. Ct. 361 (2018) ..............................................................................................17, 18

*Winter v. Nat. Res. Def. Council*,
   555 U.S. 7 (2008) ..........................................................................................................15

*Wis. Gas Co. v. FERC*,
   758 F.2d 669 (D.C. Cir. 1985) ......................................................................................39

*Zarmach Oil Servs., Inc. v. U.S. Dep't of the Treasury*,
   750 F. Supp. 2d 150 (D.D.C. 2010) ..............................................................................20

*Zevallos v. Obama*,
   10 F. Supp. 3d 111 (D.D.C. 2014) ..........................................................................20, 32

*Zevallos v. Obama*,
   793 F.3d 106 (D.C. Cir. 2015) ......................................................................................33

*Zivotofsky ex rel. Zivotofsky v. Clinton*,
   566 U.S. 189 (2012) ................................................................................................33, 34

**Constitutional Provisions and Statutes**

U.S. Const., amend. V............................................................................................. *passim*

National Defense Authorization Act for Fiscal Year 1999 Section 1237, Pub. L.
   105-261, 112 Stat. 2160 (Oct. 17, 1998)............................................................ *passim*

3 U.S.C. § 301 .................................................................................................................10

5 U.S.C. § 701 *et. seq.* ............................................................................................... *passim*

8 U.S.C. § 1189 ...........................................................................................................31, 34

50 U.S.C. § 1601 *et seq.* ................................................................................................10

50 U.S.C. § 1701 *et. seq.* ...........................................................................................10, 29

**Other Authorities**

17 C.F.R. § 240.12b-2 .....................................................................................................26

31 C.F.R. § 501.807 ........................................................................................................33

31 C.F.R. § 560.215 ........................................................................................................25

31 C.F.R. § 561.322 ........................................................................................................24

American Heritage Dictionary of the English Language (5th ed. 2011) ........................23

Black's Law Dictionary ..............................................................................................23, 25

Oxford English Dictionary...............................................................................................23

Webster's New International Dictionary .....................................................................24, 26

## INTRODUCTION

Plaintiffs brought this action for declaratory and injunctive relief against the Trump Administration's unsupported and unlawful actions that incorrectly designated Xiaomi Corporation ("Xiaomi") as a "Communist Chinese military company" under Section 1237 of the National Defense Authorization Act for Fiscal Year 1999 (NDAA FY99), Pub. L. 105-261, 112 Stat. 2160 (Oct. 17, 1998) (as amended) ("Section 1237").  That Designation means that U.S. persons are prohibited from purchasing, and ultimately from possessing, Xiaomi's publicly traded securities and derivatives of such securities.  Plaintiffs now seek a preliminary injunction against the Designation and the enforcement against Xiaomi of these Restrictions, which otherwise will begin to take effect at 9:30 a.m. on March 15, 2021.

Xiaomi is not a "Communist Chinese military company" ("CCMC"), for purposes of Section 1237 or otherwise.  It is a consumer electronics company that offers a broad range of consumer products designed for civilian and commercial use.  It is publicly traded on the Hong Kong Stock Exchange, widely held, and effectively controlled by two of its co-founders, Lei Jun and Plaintiff Bin Lin, who serve as Chairman and Vice Chairman of the company's board.  Lei Jun and Bin Lin are veteran tech-industry executives, not members of China's state security services or military forces.  They occupy senior management positions within the company and collectively own more than one-third of the company's shares, with approximately three-quarters of the company's voting rights.  Only Lei Jun and Bin Lin, their co-founders, and a handful of non-Chinese institutional investors own more than one percent of Xiaomi's shares.

It thus was a complete surprise to Xiaomi, its employees, and its shareholders when, on January 14, 2021, without prior notice or explanation, the Trump Administration's Department of Defense designated Xiaomi as a CCMC.  That Designation placed Xiaomi under the Restrictions

imposed by an executive order issued by the Trump Administration, which forbids U.S. persons—including the individual Plaintiffs here—from purchasing publicly traded Xiaomi securities or derivatives of those securities as of March 15, 2021, and requires them to divest their holdings by January 14, 2022.[1]  Beginning on March 15, 2021, these Restrictions will largely cut off Xiaomi's access to new investment from U.S. capital markets, depriving the company of funds to pursue research and development and to acquire other businesses, and will force the individual Plaintiffs to sell their Xiaomi Securities and prohibit them from receiving compensation in the form of Xiaomi shares or options in the future.

The Department of Defense's Designation and the application of those Restrictions to Xiaomi violate the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* ("APA"), Section 1237, and the Due Process Clause of the Fifth Amendment to the U.S. Constitution.  The Designation is arbitrary, capricious, and contrary to law, in violation of the APA, because it is wholly unexplained, unsupported by evidence—let alone "substantial evidence"—and necessarily runs counter to any accurate information before the agency.  *See infra* pp. 16–21.  The Designation also exceeds the agency's statutory authority under Section 1237 because Xiaomi does not satisfy the statutory requirements for the Department of Defense to exercise its authority to designate an entity as a CCMC.  *See infra* pp. 22–26.  And Plaintiffs were denied due process by the Designation and consequent application of the Restrictions to the company without prior notice of the basis for the Designation, any opportunity to be heard and challenge the Designation before the agency, or access to the evidence on which agency relied.  *See infra* pp. 26–33.  Accordingly, Plaintiffs—

---

[1] This memorandum refers to the Department of Defense's January 14, 2021 designation of Xiaomi as a CCMC purportedly under Section 1237 as the "Designation"; to the restrictions that the November 12, 2020 and January 13, 2021 executive orders impose on transactions in, or possession of, CCMC publicly traded securities and derivatives of such securities (collectively, "Securities") as the "Restrictions"; and to the Trump Administration's November 12 and January 13 executive orders as the "Executive Orders."

Xiaomi and three individual U.S. citizens who are employed by Xiaomi and own Xiaomi Securities—are likely to succeed on the merits of their claims.

Plaintiffs also satisfy the other requirements for injunctive relief:  They will suffer irreparable harm if the Designation and Restrictions are not preliminarily enjoined by their March 15 effective date, and the balance of equities and public interest favor enjoining application of Defendants' unlawful and unconstitutional actions until Plaintiffs' challenges can be adjudicated, particularly because Defendants will suffer no harm from the temporary delay of the implementation and enforcement of the Designation and Restrictions as applied to Xiaomi.

Plaintiffs do not challenge here the Department of Defense's authority to designate CCMCs under Section 1237 as a general matter, nor to impose sanctions on entities lawfully designated pursuant to that statutory authority.  Plaintiffs challenge Defendants' designation of Xiaomi as unlawful, however, because it did not accord with the APA, Section 1237, or the Due Process Clause.  Had Defendants complied with those requirements, there would be no basis for such a designation of Xiaomi.  Accordingly, this Court should enjoin implementation and enforcement of the Designation, as well as the Restrictions as applied to Xiaomi, until Plaintiffs' claims are adjudicated on the merits.[2]

---

[2] In the alternative, Plaintiffs ask this Court to enter a stay under the APA, 5 U.S.C. § 705, of the Designation and implementation of the Restrictions against Xiaomi until such time as this Court can adjudicate Plaintiffs' challenges on the merits.  "The factors governing issuance of a preliminary injunction also govern issuance of a § 705 stay." *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020).

## STATEMENT OF FACTS

### A.  Xiaomi Is a Consumer Electronics Company with Extensive Ties to the United States.

Xiaomi was founded in 2010 by two engineers who shared the goal of making a better smartphone: entrepreneur and investor Lei Jun and veteran tech executive Bin Lin.[3]  Decl. of Bin Lin ("Bin Lin Decl.") ¶ 1.  Lei Jun is Xiaomi's CEO, Chairman of Xiaomi's Board of Directors, and largest shareholder.  *Id.* ¶¶ 17–19.  Bin Lin is Vice Chairman of Xiaomi's Board and the company's second-largest shareholder.  *Id.* ¶¶ 2, 17.  Since the founding of the company, Bin Lin, together with Lei Jun, has been responsible for making important strategic decisions for the company and overseeing its day-to-day management.  *Id.* ¶ 2.

Due both to Xiaomi's commitment to providing high-quality and user-friendly products at attainable prices, and to substantial investments by internationally recognized venture capital firms, Xiaomi has grown rapidly.  *Id.* ¶¶ 5, 15.  Within two years of its founding, Xiaomi generated over a billion dollars in annual revenue.  Decl. of Megan A. Crowley ("Crowley Decl.") Ex. A at 7.  Now—scarcely a decade after its founding—the company is publicly traded on the Hong Kong Stock Exchange, generated approximately $29.5 billion in revenue (as of 2019), and as of January 13, 2021, had a market capitalization of approximately $106 billion.  Bin Lin Decl. ¶¶ 4, 16, 30.[4]

Xiaomi is now the third-largest smartphone manufacturer in the world by volume, shipping more than 40 million phones in the last quarter of 2020 alone.  *Id.* ¶ 5.  Smartphones remain Xiaomi's largest business line, responsible for over 60 percent of the company's total revenue for

---

[3] Lei Jun is identified using his last name followed by his given name.  All other individuals referenced in this memorandum are identified using their first names followed by their given names.

[4] *See also* Xiaomi Corp. (1810.HK), Yahoo Finance, https://finance.yahoo.com/quote/1810.HK/ (last accessed Feb. 16, 2021) (stating that as of February 16, 2021, Xiaomi had a market capitalization of approximately HKD 744 billion, or $96 billion).

the nine months ending on September 30, 2020.  *Id.*  But Xiaomi has grown well beyond smartphones, and now also offers a large set of consumer lifestyle electronics (also known as "Internet of Things" or "IoT") products, such as smart televisions, smart speakers, and household appliances such as air purifiers, rice cookers, and robot vacuums, as well as laptop and tablet computers, smart watches, wristbands, powerbanks, and electric scooters.  *Id.*; *see also* Xiaomi Home Page (product catalog), https://xiaomi-mi.com/ (last visited Feb. 16, 2021).  In addition to this extensive line of consumer hardware products, Xiaomi also offers its users a wide range of internet services in China, including content, entertainment, financial services, and productivity tools.  Bin Lin Decl. ¶ 5.  Xiaomi's offerings are diverse and expanding, and all of these products and services are designed for civilian and commercial use:  Xiaomi does not design or manufacture any products for military use.  *Id.* ¶ 23.

Xiaomi is a multinational corporation.  More than 50 percent of Xiaomi's revenue now comes from sales outside mainland China.  *Id.* ¶ 4.  Indeed, Xiaomi is among the top four smartphone manufacturers not only in China, where it is headquartered, but also worldwide, and has been the number-one seller of smartphones in India for nearly every quarter since late 2017.[5]

Xiaomi's multinational business includes extensive ties to the United States, including two subsidiaries organized and headquartered in the United States, and an office located in this country.  Bin Lin Decl. ¶ 11.  In the past three years, Xiaomi has spent more than $16.2 billion on components, and more than $1.6 billion on software and services, supplied by U.S. corporations.  *Id.* ¶ 10.  Xiaomi has had an especially productive partnership with the U.S. technology firm

---

[5] *See, e.g.*, Counterpoint Res., Global Smartphone Market Share: By Quarter (Nov. 20, 2020), https://www.counterpointresearch.com/global-smartphone-share/;  Counterpoint Res., India Smartphone Market Share: By Quarter (Nov. 17, 2020), https://www.counterpointresearch.com/india-smartphone-share/.

Qualcomm, which was one of the company's earliest investors and has supplied the Snapdragon chipsets that have powered each premium smartphone Xiaomi has launched since 2011. *Id.* ¶¶ 10, 15. Although the company does not distribute smartphones in the United States, it sold more than $300 million in other consumer electronics products in this country between 2016 and 2020. *Id.* ¶ 11. Xiaomi has raised billions from U.S. investors, in the process generating hundreds of millions in fees for U.S.-headquartered financial institutions. *Id.* ¶ 12. For example, in 2020 alone, Xiaomi raised approximately $4.5 billion through the issuance of U.S.-dollar-denominated bonds, convertible bonds, and common shares. Approximately one-third of this total was placed with U.S. investors. *Id.* These and similar transactions generated over $120 million in fees in the past three years for the U.S. financial institutions that underwrote them. *Id.*

Xiaomi's ties with the United States are also personal. Plaintiff Bin Lin is a citizen of the United States. *Id.* ¶ 1. Before co-founding Xiaomi, he studied in the United States and worked for more than a decade for several large U.S. tech firms. *Id.* The other individual Plaintiffs in this suit are also citizens of the United States. *See* Decl. of Peng Lin ("Peng Lin Decl.") ¶ 1; Decl. of Stephen Sean English ("English Decl.") ¶ 1. One of Xiaomi's independent non-executive directors is also a U.S. citizen. Bin Lin Decl. ¶ 18.

**B.     Xiaomi Is Widely Held, Publicly Traded, and Ultimately Controlled by Its Founders.**

Xiaomi's rapid growth has been fueled by substantial investments of private capital from both inside and outside China. Having launched in 2010 with $10.25 million in seed capital, Xiaomi proceeded to raise approximately $1.5 billion in private capital in the following eight years. *Id.* ¶ 15. In 2018, Xiaomi went public, listing shares on the Hong Kong Stock Exchange, and raising approximately $3.5 billion. *Id.* ¶ 16. As the following table of its top ten shareholders illustrates, Xiaomi is widely held, with more than half the shares in the company owned by

investors that each own one percent of the company or less:

| No. | Shareholder | Percent[6] | Country | Ordinary Shares[7] |
|---|---|---|---|---|
| 1 | Lei Jun | 26.5% | China | 6,670,539,142 |
| 2 | Bin Lin | 9.5% | U.S. | 2,399,920,210 |
| 3 | BlackRock, Inc. | 3.0% | U.S. | 762,394,928 |
| 4 | Feng Hong (co-founder) | 2.2% | China | 561,572,709 |
| 5 | The Vanguard Group, Inc. | 1.9% | U.S. | 468,527,146 |
| 6 | Kong-Kat Wong (co-founder) | 1.8% | China | 463,484,897 |
| 7 | State Street Corporation | 1.6% | U.S. | 392,022,535 |
| 8 | HSBC Holdings | 1.2% | U.K. | 295,623,962 |
| 9 | GIC | 1.0% | Singapore | 260,769,810 |
| 10 | Wanqiang Li (co-founder) | 1.0% | China | 240,928,340 |
| | **Total (Top Ten Shareholders)** | **49.7%** | | **12,515,783,679** |

*See* Bin Lin Decl. ¶ 17 (table based on third-party analysis as of December 31, 2020).

As this chart also illustrates, following the IPO, the largest ownership interests in Xiaomi are held by its co-founders, a handful of U.S. and U.K. financial institutions, and a Singaporean sovereign wealth fund. None of these individuals or entities are affiliated with China's military, police, or intelligence services.

---

[6, 7] The "Percent" and "Total Shares" columns refer to all Xiaomi ordinary shares, including both the Class A shares with enhanced voting rights, which are owned exclusively by Lei Jun and Bin Lin, and the Class B shares owned by all other equity investors. In addition to his Class A Shares, Bin Lin owns approximately 1.9 billion Class B shares, amounting to 9.4% of the company's Class B shares. Bin Lin Decl. ¶ 14.

Although Xiaomi is publicly traded, it is governed by its management and board, and ultimately controlled by its founders.  Bin Lin Decl. ¶ 13.  When Lei Jun and Bin Lin founded Xiaomi in 2010, they designed a weighted-voting-rights structure to ensure that they would retain full control over the company.  *Id.*[8]  Under that structure, Lei Jun and Bin Lin acquired Class A shares that, upon Xiaomi's IPO, would carry ten times the voting rights per share as the Class B shares, which were the only shares issued to other investors.  *Id.*  Lei Jun and Bin Lin were the only recipients of the Class A shares, only Class B shares were listed in the IPO, and Xiaomi's American Depositary Receipts ("ADRs") track only the Class B shares.  *Id.*  No Class A shares have been issued since the IPO.  These enhanced voting rights effectively exist only so long as Lei Jun or Bin Lin hold these shares; if Class A shares are transferred to third parties (subject to narrow exceptions) they are irrevocably converted to Class B shares.  *Id.*; Crowley Decl. Ex. A at III-2 to III-3.  As a result of this structure, Lei Jun and Bin Lin control more than 75 percent of the company's voting rights while owning approximately 36 percent of the company's total shares outstanding.  *Id.* ¶ 14.  They exercise control over Xiaomi to the maximum extent permitted by the rules of the Hong Kong Stock Exchange, where the company is listed.  *Id.* ¶¶ 14, 19; *see also* HKEX, Consolidated Main Board Listing Rules at 8A-1 to 8A-13, *available at* https://en-rules.hkex.com.hk/sites/default/files/net_file_store/consol_mb.pdf.

Lei Jun and Bin Lin are also principally responsible for Xiaomi's oversight and operations. Xiaomi is overseen by a distinguished board of seven directors, three of whom are independent,

---

[8] Weighted-voting-rights structures are not uncommon among publicly traded U.S. corporations, and have been adopted as part of numerous technology-sector IPOs in recent years. *See* Dual Class Companies List, Council of Institutional Invs., https://www.cii.org/files/ FINAL%20format%20Dual%20Class%20List%209-27-19.pdf (updated Sept. 2019) (listing among the many companies that have adopted dual or multiple share classes Alphabet (formerly known as Google), Berkshire Hathaway, Facebook, The New York Times Company, UPS, and Zoom).

and two of whom are U.S. citizens.  Bin Lin Decl. ¶ 18.  Lei Jun and Bin Lin are, as noted, Chairman and Vice Chairman, respectively, of Xiaomi's board.  Xiaomi's business is overseen on a day-to-day basis by an accomplished senior management team which Lei Jun is CEO and Bin Lin is a senior member.  *Id.* ¶ 19.

### C. The Department of Defense Designated Xiaomi a Communist Chinese Military Company (CCMC) In the Final Three Full Working Days of the Trump Administration, Without Notice or Explanation.

#### 1. Congress Provided for the Designation of Certain Entities as CCMCs Pursuant to a Statutory Process and Criteria.

Enacted in 1998, Section 1237 directed the Secretary of Defense, in consultation with the Attorney General, the Director of the Federal Bureau of Investigation, and the Director of Central Intelligence,[9] to identify "[CCMCs] that operate directly or indirectly in the United States or any of its territories or possessions."  NDAA FY99 § 1237(b).  Section 1237 defines CCMC as a person that "(i) is owned or controlled by, or affiliated with, the People's Liberation Army or a ministry of the government of the People's Republic of China or that is owned or controlled by an entity affiliated with the defense industrial base of the People's Republic of China; and (ii) is engaged in providing commercial services, manufacturing, producing, or exporting," *id.* § 1237(b)(4)(B), or persons identified in certain intelligence publications, *id.* § 1237(b)(4)(A).  The statute further defines "People's Liberation Army" as "the land, naval, and air military services, the police, and the intelligence services of the Communist Government of the People's Republic of China, and any member of any such service or of such police."  *Id.* § 1237(c).

---

[9] Section 1081 of the Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. 108-458, 118 Stat. 3638, 3696, provided that statutory references to the "Director of Central Intelligence" should be deemed to refer to the newly created Director of National Intelligence, when referring to the Director of Central Intelligence "in the Director's capacity as the head of the intelligence community" and to the Director of the Central Intelligence Agency when referring to the Director "in the Director's capacity as the head of the Central Intelligence Agency."

Section 1237 required the Secretary of Defense to create a list of CCMCs by no later than March 1, 2001, and to update the list annually, but the Department of Defense published its first list of designated CCMCs on June 24, 2020. *See* Crowley Decl. Exs. B, C. That list designated 20 companies without supporting material or explanation as to why those companies had been so designated. *See* Crowley Decl. Ex. C. On August 28, 2020, and again on December 3, 2020, the Department published two more lists designating 15 more companies as CCMCs. *See* Crowley Decl. Exs. D, E, F. Those lists, too, were unaccompanied by explanation or information about the basis for the Government's designation as CCMCs.

    2. <u>Under an Executive Order Issued by President Trump, Transactions by U.S. Persons in the Securities of a Designated CCMC Are Restricted.</u>

Because of an executive order issued by then-President Trump in November 2020 and amended in January 2021, the effect of the Defense Department's designation of CCMCs is to subject such companies to a sanctions regime that severely restricts U.S. persons—including U.S. citizens and residents and entities organized under U.S. law—from transacting in the Securities of the companies so designated. *See* Exec. Order No. 13959, 85 Fed. Reg. 73185 (Nov. 12, 2020), *amended by* Exec. Order No. 13974, 86 Fed. Reg. 4875 (Jan. 13, 2021).

***The November 12, 2020 Order.*** In the November Order, the President declared a national emergency with respect to "the [People's Republic of China's ('PRC's)] military-industrial complex, by directly supporting the efforts of the PRC's military, intelligence, and other security apparatuses" and invoked the International Emergency Economic Powers Act (50 U.S.C. § 1701 *et seq.*) ("IEEPA"), the National Emergencies Act (50 U.S.C. § 1601 *et seq.*), and 3 U.S.C. § 301. Exec. Order No. 13959, Preamble. Among other things, the executive order restricts, beginning 60 days after a company is designated as a CCMC, any U.S. person from transacting in the Securities of that company, except for transactions undertaken within the year after designation

solely to divest from Securities held within this initial 60-day period.  *Id.* § 1(a)(ii), (c).  The executive order also purports to apply notwithstanding any prior contract, to prohibit actual or attempted transactions by U.S. persons or within the United States to evade these prohibitions, and to prohibit conspiracies formed to violate these prohibitions.  *Id.* §§ 1(d), (2).  The order defines "Communist Chinese military company" to include "any person that the Secretary of Defense, in consultation with the Secretary of the Treasury, determines is a Communist Chinese military company operating directly or indirectly in the United States or in any of its territories or possessions and therefore lists as such pursuant to section 1237 of Public Law 105-261, as amended . . . ."  *Id.* § 4(a)(ii).

*The January 13, 2021 Order.*  Then-President Trump subsequently issued Executive Order No. 13974, which amended the November Order in certain respects.  Among other things, the January Order provides that U.S. persons are forbidden from possessing the Securities of a CCMC more than 365 days after the designation of that CCMC.  Exec. Order No. 13974, § 1.  It also revised the definition of "Communist Chinese military company" under Section 4(a)(ii) of the November Order to refer to "any person that the Secretary of Defense, in consultation with the Secretary of the Treasury, publicly lists as a Communist Chinese military company meeting the criteria in section 1237(b)(4)(B) of Public Law 105-261, as amended . . . , and that operates directly or indirectly in the United States or any of its possessions," and specified that "[t]his definition shall apply regardless of whether the Secretary of Defense must provide the report described in section 1237(b)(2) of Public Law 105-261, as amended . . . ."  *Id.* § 2.

3.  <u>After the Issuance of the Executive Order, and Only Three Working Days Before the End of the Trump Administration, the Department of Defense, Without Notice or Explanation, Designated Xiaomi a CCMC.</u>

As noted, on January 14, 2021, the Trump Department of Defense—presumably after consultation with the Department of the Treasury, as required by the Executive Orders—published

another list of CCMCs, entitled "Qualifying Entities Prepared in Response to Section 1237 of the National Defense Authorization Act for Fiscal Year 1999 (PUBLIC LAW 105-261)" and subtitled "Tranche 5." Crowley Decl. Ex. H. The list designated Xiaomi as a CCMC. Neither the list nor any accompanying document—including the Department of Defense's press release that accompanied the list—explained why Xiaomi or any other company had been designated as a CCMC or provided any material supporting that decision. *See* Crowley Decl. Ex. I. As a result of Xiaomi's Designation, U.S. persons will be restricted from transacting in (other than to divest from) Xiaomi Securities as of March 15, 2021, and will be restricted from possessing these Securities as of January 14, 2022.

4.       The Department of Defense's Designation of Xiaomi as a CCMC Is Causing and Will Continue to Cause Plaintiffs Irreparable Harm.

The Department of Defense's Designation of Xiaomi as a CCMC came as a surprise to the company, its senior management team, and its shareholders. Bin Lin Decl. ¶¶ 20, 30 fig. As discussed above, Xiaomi is a consumer electronics company that is publicly traded, widely held, governed by its management and board, controlled by its founders, and not affiliated with the People's Liberation Army or any Chinese government ministry. *See supra* pp. 4–9. There is no valid reason for Xiaomi to have been designated as a CCMC. Moreover, Xiaomi did not receive any prior notice that the Department of Defense was considering designating it as a CCMC, or any material on which the agency relied. After the Designation was announced, Xiaomi's shares traded down more than 10 percent from their price at the close of the previous day of trading. Xiaomi Corp.        (Historical        Data),        Yahoo        Finance, https://finance.yahoo.com/quote/1810.HK/history?p=1810.HK (last visited Feb. 16, 2021). As of February 16, 2021, Xiaomi's share price remains down 9.5 percent from its price at the close of the trading day preceding the announcement of the Designation. *Id.*

As explained in greater detail below and in the declarations of the individual Plaintiffs, the Department of Defense's Designation and the impending implementation of the Restrictions have already taken a significant toll on Xiaomi and its shareholders, and these adverse effects will escalate the longer the Designation stands and as the Restrictions are implemented.

Xiaomi competes in highly competitive global markets characterized by rapid and continuous innovation in products and features. *See* Crowley Decl. Ex. A at 48. To remain competitive, Xiaomi must invest significantly and constantly in research and development and in other growth opportunities. *Id.* To finance these investments, Xiaomi has repeatedly sought outside equity and debt investments, including from investors in the United States, which has the world's deepest and most liquid capital markets. Bin Lin Decl. ¶¶ 12, 26. By effectively cutting Xiaomi off from U.S. investors and making Xiaomi's publicly traded shares unattractive or even useless as consideration for acquiring companies or other assets from U.S. persons, the Designation and Restrictions will dramatically impair Xiaomi's value as a company—as they have already done. *See supra* p. 12; *infra* pp. 35–40. They also will irreversibly damage Xiaomi's relationships with U.S. financial institutions—which are critical to Xiaomi's ability to raise the capital it needs to compete, and which provide Xiaomi with ideas about potential acquisitions and advice about the financial products Xiaomi could use to most efficiently raise capital. Indeed, the Designation and Restrictions have already caused Xiaomi to miss at least one strategic acquisition opportunity. Bin Lin Decl. ¶¶ 27–28.

In addition, the Designation and Restrictions have impaired, and unless enjoined will continue to impair, Xiaomi's efforts to recruit and retain talented employees. Xiaomi's success depends on its ability to recruit software engineers and other technical employees, who are highly in-demand among technology-oriented companies. *Id.* ¶ 33. Xiaomi accordingly competes

fiercely to recruit these employees, and Bin Lin and other senior executives spend a significant percentage of their time recruiting senior engineers and scientists.  *See id.*  By hamstringing Xiaomi's future prospects, the Designation and Restrictions have also undercut the company's ability to recruit top talent—indeed, two potential senior recruits have stated that they are unwilling to join Xiaomi because of the measures the U.S. Government has taken against the company.  *Id.*

The Designation and Restrictions have damaged and will continue to damage Xiaomi's reputation and goodwill in the marketplace more generally.  *See id.* ¶ 32.  If the Designation remains in place and the Restrictions are implemented, Plaintiffs will suffer harm that cannot be fully redressed even if the Designation and Restrictions are eventually set aside.

### D.   Plaintiffs Sued to Invalidate the Unlawful Designation and Restrictions and Move for a Preliminary Injunction Before the March 15, 2021 Effective Date.

Already suffering the immediate adverse effects of the Department of Defense's Designation, and facing the imminent implementation of the Restrictions against non-divestiture transactions in Xiaomi Securities by U.S. persons, Xiaomi filed this action on January 29, 2021, challenging the Designation under the APA and Fifth Amendment and naming as defendants the Department of Defense, the Department of the Treasury, and the Secretaries of Defense and the Treasury.  Compl., ECF No. 1.  Xiaomi amended its complaint to add the individual Plaintiffs and the President in his official capacity, and to add further legal claims challenging both the Designation and, on an as-applied basis, the Restrictions.  Am. Compl., ECF No. 9.

The Government has not yet provided any administrative record to support the Designation and application of the Restrictions to Xiaomi.  *See* Unopposed Scheduling Motion, ECF No. 13. Plaintiffs' counsel acted promptly to request the administrative record from the Government.  On the day Plaintiffs filed suit, their counsel contacted the Department of Justice to meet and confer about scheduling, including briefing of Plaintiffs' preliminary injunction motion.  On February 5,

counsel for the Government responded to Plaintiffs' counsel, informing Plaintiffs' counsel that the Government was in the process of compiling an administrative record and hoped to be in a better position to discuss scheduling in the following week.  Five days later, Defendants' counsel stated via email that he remained unsure as to when Defendants would be able to provide the administrative record.  *Id.*  With March 15 approaching, Plaintiffs explained to the Government that they would need to file their preliminary injunction motion without the benefit of the administrative record to prevent the irreparable harm that they will otherwise suffer on March 15, 2021.  Plaintiffs reached agreement with the Government on a briefing schedule, which was subsequently approved by the Court.  ECF No. 14.  As of the filing of this brief, Defendants have not produced an administrative record.

## ARGUMENT

The Court should enter a preliminary injunction against implementation or enforcement of the Designation or the Restrictions as applied to Xiaomi.  Plaintiffs have established that (1) there is a likelihood of success on the merits of their claims, (2) they will face irreparable harm in the absence of preliminary relief, (3) the balance of equities favors preliminary relief, and (4) an injunction is in the public interest.  *See, e.g.*, *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008).

## I.      Plaintiffs Are Likely to Succeed on the Merits of Their Claims That the Designation and Restrictions Are Unlawful and Unconstitutional.

"[T]he first and most important factor" in the *Winter* analysis—"whether [Plaintiffs] have established a likelihood of success on the merits"—weighs heavily in Plaintiffs' favor.  *See Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014).  Plaintiffs are highly likely to succeed on the merits of their claims that the Department of Defense's out-of-the-blue, unexplained, unsupported, and baseless Designation was not the product of the reasoned agency decision-

making required by the APA, exceeded the authority vested in the Department of Defense by

Section 1237, and failed to abide by constitutional due process requirements.[10]

A.     **Plaintiffs Are Likely to Succeed on the Merits of Their Claim that the Designation Was Arbitrary, Capricious, and Contrary to Law in Violation of the APA.**

In evaluating agency actions under the "arbitrary and capricious" standard, courts "must

consider whether the [agency's] decision was based on a consideration of the relevant factors and

whether there has been a clear error of judgment." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360,

378 (1989) (quotations omitted).  An agency acts arbitrarily, capriciously, and contrary to law, in

violation of the APA, when it "relie[s] on factors which Congress has not intended it to consider,

entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation for its

decision that runs counter to the evidence before the agency, or is so implausible that it could not

be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n*

*of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Moreover, when review

of an agency's action is "bound up with a record-based factual conclusion," the reviewing court

must determine whether that conclusion "is supported by substantial evidence." *Dickinson v.*

*Zurko*, 527 U.S. 150, 164 (1999) (quotations omitted).

The Trump Department of Defense's Designation of Xiaomi was arbitrary, capricious, and

contrary to law because the agency failed to provide a reasonable explanation for its action, and

---

[10] The Amended Complaint also alleges that the Department of Defense violated Section 1237 by failing to comply with Section 1237(b)(3)'s consultation requirement.  Am. Compl. ¶¶ 62–68. Although the mismatch between the executive order (which requires consultation only with the Treasury Department) and Section 1237 (which requires consultation with specified intelligence and law enforcement agencies) suggests that the Department of Defense failed to satisfy its statutory consultation obligations, Defendants have yet to produce an administrative record that would shed light on the extent (if any) to which they consulted these other agencies prior to designating Xiaomi a CCMC.  Plaintiffs reserve the right to supplement this brief once Defendants file an administrative record.

made a designation that was not supported by substantial evidence and runs counter to any accurate information before the agency.

       1.    <u>The Department of Defense's Designation of Xiaomi as a CCMC under Section 1237 is Reviewable under the APA.</u>

The Designation is reviewable under the APA as final agency action for which there is no other remedy, 5 U.S.C. § 704, and which has not been committed by law to agency discretion, *id.* § 701(a)(2). *See TikTok Inc. v. Trump*, No. 20-CV-2658 (CJN), 2020 WL 7233557, at *13 (D.D.C. Dec. 7, 2020) ("The D.C. Circuit has already held that the decision-making process an agency employs to effectuate an executive order issued under IEEPA is subject to arbitrary and capricious review." (citing *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 162 (D.C. Cir. 2003))).

The Designation is uncontestably "final agency action." It "marks the consummation" of the Department of Defense's decision-making process with respect to whether to designate Xiaomi as a CCMC under Section 1237, and it is not of "merely tentative or interlocutory nature." *See Bennett v. Spear*, 520 U.S. 154, 178 (1997). Moreover, "direct and appreciable" "legal consequences will flow" from the Designation, which made Xiaomi and its U.S. person shareholders subject to the Restrictions. *See id.*; *cf. Parsons v. Dep't of Justice*, 878 F.3d 162, 169 (6th Cir. 2017) (no final agency action where gang designation did not "impose liability, determine legal rights or obligations, or mandate, bind, or limit other government actors"). Section 1237 does not provide a separate means for judicial review of designation actions, so such agency actions are presumptively reviewable under the APA. *See, e.g.*, *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018) (noting existence of "strong presumption favoring judicial review of administrative action" (quotation marks omitted)).

Congress did not commit Section 1237 Designation authority to unreviewable agency

discretion as a matter of law.  The APA exempts agency action from judicial review under 5 U.S.C. § 701(a)(2) only in "very narrow, . . . rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'"  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1997).  Section 1237 does not leave a designation as a CCMC to agency discretion.  Section 1237 specifies in detail the criteria that must be met by an entity before the Department of Defense is authorized to exercise its designation authority.  *See* NDAA FY99 § 1237(b)(4), (c).  Section 1237 thus supplies clear legal standards for review of Plaintiffs' substantive challenges to the Designation, and the APA and Fifth Amendment supply the law to apply in review of Plaintiffs' arbitrary-and-capricious and due process claims.  *CAIR v. Dep't of Justice*, 264 F. Supp. 2d 14, 23 (D.D.C. 2003) ("familiar APA concepts" themselves "provide the core standards for judicial review"); *Nat'l Fed'n of Fed. Empls. v. Weinberger*, 818 F.2d 935, 941 n.11 (D.C. Cir. 1987) ("[T]here is clearly 'law to apply'—the Constitution.").  Nor is the Department of Defense's Designation of Xiaomi as a CCMC the kind of agency action "that courts have traditionally regarded as unreviewable."  *Weyerhaeuser*, 139 S. Ct. at 370.  Instead, this case "involves the sort of routine dispute that federal courts regularly review:  An agency issues an order affecting the rights of a private party, and the private party objects that the agency did not properly justify its determination under a standard set forth in the statute."  *Id.*; *see also, e.g.*, *Olenga v. Gacki*, No. 19-CV-1135 (RDM), 2020 WL 7024206, at *13 (D.D.C. Nov. 30, 2020) (reviewing Department of the Treasury's Office of Foreign Assets Control designation decision under the APA).

## 2.    The Department of Defense Fails to Explain Its Decision.

Plaintiffs are likely to succeed on the merits of their APA claim because the Designation is entirely unexplained.  The Designation document issued by the Department of Defense contains nothing other than a title and a list of nine business names.  Crowley Decl. Ex. H.  Neither the

document itself, the Department of Defense's press release announcing the Designation, nor any other publically available materials, offer the slightest rationale for why the Department of Defense mistakenly believed that Xiaomi could be designated as a CCMC.  *See* Crowley Decl. Ex. I.

The APA does not tolerate such unexplained agency action.  "It is axiomatic that the APA requires an agency to explain its basis for a decision."  *Physicians for Social Responsibility v. Wheeler*, 956 F.3d 634, 644 (D.C. Cir. 2020); *see SEC v. Chenery*, 318 U.S. 80, 94 (1943) ("[C]ourts cannot exercise their duty of review unless they are advised of the considerations underlying the action under review.").  When an agency has not "articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made," *State Farm*, 463 U.S. at 43 (internal quotation marks omitted), courts routinely conclude that the agency's action is arbitrary and capricious.  *See, e.g.*, *County of Los Angeles v. Shalala*, 192 F.3d 1005, 1021 (D.C. Cir. 1999) (where "the agency has failed to provide a reasoned explanation . . . [the court] must undo its action").

There is no national-security exception to this fundamental principle of APA review, and courts have refused to countenance action by national security agencies that fall short of the APA's reasoned-explanation requirement.  *See Kirwa v. Dep't of Def.*, 285 F. Supp. 3d 257, 270 (D.D.C. 2018) (APA review "involves more than a court rubberstamping action based on bare declarations from the agency amounting to 'trust us, we had good national security reasons for what we did'").  For example, in *Epsilon Electronics, Inc. v. Department of Treasury*, the D.C. Circuit ordered the Department of the Treasury's Office of Foreign Assets Control ("OFAC") to reconsider its decision that certain shipments by an audio equipment manufacturer violated trade sanctions imposed against Iran.  857 F.3d 913, 927–30 (D.C. Cir. 2017).  Although substantial evidence supported OFAC's determination that the manufacturer's earlier shipments were unlawful, the

19

record also contained evidence suggesting that the manufacturer had thought the later shipments would be sold in Dubai, not resold to Iran.  *Id.* at 927–28.  Because "OFAC failed to explain adequately why it discounted that evidence," the D.C. Circuit concluded that the agency's decision was arbitrary and capricious.  *Id.* at 927.  Here, of course, the Department of Defense has not simply failed to explain an important aspect of its action, but has failed to provide *any rationale whatsoever* for its action against Xiaomi, a consumer electronics company.  Although a court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," *State Farm*, 463 U.S. at 43 (quotation marks omitted), "[w]here an agency 'has failed . . . to explain the path it has taken, [courts] have no choice but to remand for a reasoned explanation," *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1407 (D.C. Cir. 1995) (quoting *Tex Tin Corp. v. EPA*, 935 F.2d 1321, 1324 (D.C. Cir. 1991)).

Cases involving challenges to OFAC designations underscore the Designation's unlawfulness.  Courts in this Circuit have repeatedly stated that OFAC designations are reviewable under the "arbitrary and capricious" standard, which requires the agency to "articulate a satisfactory explanation for its action."  *See, e.g.*, *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007); *see also TikTok*, 2020 WL 7233557, at *14 (reviewing IEEPA prohibitions under arbitrary and capricious standard).[11]  No court appears ever to have sustained an OFAC decision that—like the Designation—lacks any discernible rationale, let alone a "satisfactory" or reasoned one.  The absence of any articulated rationale for the Designation is

---

[11] *See also Olenga*, 2020 WL 7024206, at *13; *Rakhimov v. Gacki*, No. 19-CV-2554 (JEB), 2020 WL 1911561, at *5–6 (D.D.C. Apr. 20, 2020); *Sulemane v. Mnuchin*, No. CV 16-1822 (TJK), 2019 WL 77428, at *5 (D.D.C. Jan. 2, 2019); *Joumaa v. Mnuchin*, No. 17-CV-2780 (TJK), 2019 WL 1559453, at *7 (D.D.C. Apr. 10, 2019), *aff'd*, 798 F. App'x 667 (D.C. Cir. 2020); *OKKO Bus. PE v. Lew*, 133 F. Supp. 3d 17, 26 (D.D.C. 2015); *Zevallos v. Obama*, 10 F. Supp. 3d 111, 118 (D.D.C. 2014), *aff'd*, 793 F.3d 106 (D.C. Cir. 2015); *Kadi v. Geithner*, 42 F. Supp. 3d 1, 9 (D.D.C. 2012); *Zarmach Oil Servs., Inc. v. U.S. Dep't of the Treasury*, 750 F. Supp. 2d 150, 154 (D.D.C. 2010).

accordingly, by itself, reason to grant Plaintiffs' motion and issue a preliminary injunction.

          3.     <u>The Department of Defense's Designation Is Not Supported by Substantial Evidence and Is Necessarily Contrary to Any Accurate Information Before the Agency.</u>

An agency action is not valid under the APA if the agency "rel[ies] on factors which Congress has not intended [the agency] to consider," "runs counter to the evidence before the agency," or is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43.  Moreover, the agency's decision must be supported by "substantial evidence."  *Dickinson*, 527 U.S. at 164 (quotations omitted). "Substantial evidence" is "enough evidence to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury."  *Defs. of Wildlife v. Jewell*, 815 F.3d 1, 9 (D.C. Cir. 2016) (quotations and citation omitted).

Here, the Designation does not meet these baseline requirements.  Although Defendants have not yet produced an administrative record, on the basis of any valid record, the designation of Xiaomi as a CCMC under Section 1237 is arbitrary and capricious and contrary to law because it is not supported by substantial evidence, necessarily runs counter to any accurate information before the agency, and is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *State Farm*, 463 U.S. at 43.  As explained more fully below, Xiaomi is not owned or controlled by the People's Liberation Army, a Chinese government ministry, or an entity affiliated with China's defense industrial base, and is not affiliated with the Chinese army or a government ministry.  *See infra* pp. 22–26.  Therefore, the Designation of Xiaomi as a CCMC under Section 1237 is arbitrary, capricious, and contrary to law, in violation of the APA.

**B.    Plaintiffs Are Likely to Succeed on the Merits of Their Claim that the Designation Exceeded the Defense Department's Authority Under Section 1237 Because Xiaomi Does Not Meet The Criteria Required for Exercise of Such Authority.**

Plaintiffs are also likely to succeed on their claim that the Designation of Xiaomi as a CCMC exceeds the Department of Defense's authority because Xiaomi does not meet the Section 1237 criteria for an entity over which such authority can be exercised.  Accordingly, whether the Court evaluates this claim under the APA or as a non-statutory *ultra vires* claim, the Designation of Xiaomi as a CCMC was in excess of the agency's authority and therefore unlawful.  *See* 5 U.S.C. § 706(2)(C) (a court must "set aside" an "agency action" under the APA that exceeds its statutory "authority" or "limitations"); *Mittleman v. Postal Reg. Comm'n*, 757 F.3d 300, 307 (D.C. Cir. 2014) ("even when 'a plaintiff is unable to bring his case predicated on either a specific or general statutory review provision, he may still be able to institute a non-statutory review action'" (quoting *Trudeau v. FTC*, 456 F.3d 178, 189 (D.C. Cir. 2006))); *Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1173 (D.C. Cir. 2003) ("the case law in this circuit is clear that judicial review is available when an agency acts *ultra vires*").

Congress granted the Department of Defense authority to designate a company as a CCMC under Section 1237 only if the company meets certain statutory criteria.  In particular, Congress provided, *inter alia*, that the company must be either "owned or controlled" by the People's Liberation Army, a ministry of the Chinese government, or an entity affiliated with the defense industrial base of the Chinese government, or "affiliated with" the People's Liberation Army or a ministry of the Chinese government.  NDAA FY99 § 1237(b)(4)(B)(i).  For purposes of Section 1237, Congress provided that "People's Liberation Army" includes "the land, naval, and air military services, the police and the intelligence services, the police and the intelligence services of the Communist Government of the People's Republic of China," as well as "any member of

such service or such police." *Id.* § 1237(c). Here, because Xiaomi does not meet those criteria, the Department of Defense did not have authority to designate the company as a CCMC.

*First*, Xiaomi is not "owned or controlled" by any proscribed entity identified in Section 1237. "It is a fundamental canon of statutory construction that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014) (quotation omitted). The common understanding of the term "own" connotes a sense of proprietary or possessory interest that a shareholder in a large, publicly traded corporation like Xiaomi lacks. *See, e.g.*, Own, Oxford English Dictionary Online ("To have or hold as one's own; to have belonging to one, be the proprietor of, possess."); Ownership, Oxford English Dictionary Online ("The fact or state of being an owner; proprietorship, dominion; legal right of possession."); Own, Black's Law Dictionary (11th ed. 2019 ) ("To rightfully have or possess as property; to have legal title to."); *see also Cooper Industries, Ltd. v. Natl. Union Fire Ins. Co. of Pittsburgh, Pennsylvania*, 876 F.3d 119, 129 (5th Cir. 2017) ("A common dictionary definition of the verbal form of 'own' is to 'have or possess property . . . to have control over . . . . [T]he defining features of 'ownership' are 'possession, control, and dominion.'") (first quoting The American Heritage Dictionary of the English Language (5th ed. 2011), then quoting *Twichel v. MIC Gen. Ins. Corp.*, 676 N.W.2d 616, 622 (2004)). Indeed, given that even Xiaomi's largest shareholder, Lei Jun, owns fewer than 30 percent of the total ordinary shares of the corporation, Bin Lin Decl. ¶ 17, it would be unreasonable to conclude that any singular person or entity "owns" Xiaomi, let alone that Xiaomi is "owned" by anyone holding one percent or fewer of its shares.

Likewise, the common meaning of the word "control" indicates an ability to direct Xiaomi's actions. *See Massachusetts Lobstermen's Ass'n v. Ross*, 349 F. Supp. 3d 48, 60 (D.D.C.

2018) (citing Webster's New International Dictionary to define "control" as "[t]o exercise restraining or directing influence over; to dominate; regulate; hence, to hold from action; to curb; subject; overpower"), *aff'd*, 945 F.3d 535 (D.C. Cir. 2019).   Here, Xiaomi is overseen and operated, respectively, by its experienced and commercially-oriented board of directors and senior management team, subject to the ultimate oversight of the controlling shareholders:  Lei Jun and Bin Lin.  Bin Lin Decl. ¶¶ 19, 22; *see also* Crowley Decl. Ex. A at 363 (discussing Lei Jun and entities he controls as the firm's "controlling shareholders").  No one else has the ability—whether through minority share ownership, board seats, contracts, or otherwise—to "control" the company.  *See* Bin Lin Decl. ¶ 22; *cf. In re ATM Fee Antitrust Litig.*, 686 F.3d 741, 757 (9th Cir. 2012) (relying on the "ordinary meaning" of "control" to hold that because ownership of the corporation was widely dispersed and the defendants only owned a small percentage, they "had insufficient ownership interests to control" the corporation).

The regulatory definitions promulgated by Defendant Department of the Treasury are consistent with the plain meaning of the terms "own" and "control."   The Department of the Treasury has defined "owned or controlled" in the context of other IEEPA-based sanctions programs to mean "any entity . . . in which [the sanctioned government] owns a 50 percent or greater interest or a controlling interest, and any entity . . . which is otherwise controlled by that government."[12]  31 C.F.R. § 561.322; *see also id.* § 561.323 (similar); *id.* § 560.313 (similar). Likewise, the agency has issued regulations that instruct that a foreign entity is "'owned or controlled' by a United States person" for purposes of the Iranian sanctions program if the U.S.

---

[12] This definition of ownership is consistent with OFAC's 50 Percent Rule, which states that "any entity owned in the aggregate, directly or indirectly, 50 percent or more by one or more blocked persons is itself considered to be a blocked person."  Dep't of the Treasury, Revised Guidance on Entities Owned by Persons Whose Property and Interests in Property are Blocked (Aug. 13, 2014), https://home.treasury.gov/system/files/126/licensing_guidance.pdf.

person "[h]olds a 50 percent or greater equity interest by vote or value in the entity . . . [h]olds a majority of seats on the board of directors of the entity; or . . . [o]therwise controls the actions, policies, or personnel decisions of the entity." 31 C.F.R. § 560.215(a), (b). As described above, Xiaomi is directed by its senior management and board of directors, who ultimately answer to Xiaomi's shareholders. Lei Jun and Bin Lin—*not* any proscribed entity—are Xiaomi's controlling shareholders, with votes to control a majority of the company's board, to direct its senior management, and to control the actions, policies, and personnel decisions of the company. Bin Lin Decl. ¶¶ 19, 22; *see also* Crowley Decl. Ex. A at 363. Lei Jun and Bin Lin are businesspeople, not members of the Chinese military forces or security services, nor are they the People's Liberation Army, a ministry of the Chinese government, or an entity affiliated with the defense industrial base of the Chinese government. Bin Lin Decl. ¶ 22. Therefore, applying the Department of the Treasury's own interpretation of "owned or controlled," Xiaomi is owned or controlled by Lei Jun and Bin Lin and not by a proscribed entity under Section 1237.

*Second*, Xiaomi is also not "affiliated with" either entity identified by Congress in subsection (b)(4)(B)(i), *i.e.*, the People's Liberation Army or a ministry of the Chinese government. Regardless of how the term "affiliated" is construed, Xiaomi is not an "affiliate" of the Chinese army or a Chinese government ministry. *See, e.g.*, *United States v. W. Elec. Co.*, 12 F.3d 225, 230 (D.C. Cir. 1993) (noting the "usual corporate understanding of affiliation as a relationship involving ownership or control" (citing Black's Law Dictionary 54 (5th ed. 1979) ("affiliate company" defined as a "[c]ompany effectively controlled by another company"))); *Mey v. DIRECTV, LLC*, 971 F.3d 284, 289 (4th Cir. 2020) ("An affiliate is commonly understood as a company effectively controlled by another or associated with others under common ownership or control.'" (quoting Webster's Third New International Dictionary 35 (2002)); *Satterfield v. Simon*

25

*& Schuster, Inc.*, 569 F.3d 946, 955 (9th Cir. 2009) (similar).  Xiaomi is a private company that is independently managed by its board and executives; it is not directly, or indirectly through intermediaries, controlled by the army or a government ministry.  *See* Bin Lin Decl. ¶ 23; *see also* 17 C.F.R. § 240.12b-2 ("An 'affiliate' of, or a person 'affiliated' with, a specified person is a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the person specified.").  The Chinese government and military do not play—and have no right to play (for example, through share ownership or by contract)— any role in shaping the company's strategy and operations, which are singularly focused on designing and bringing to market products and services for civilian and commercial use.  *See* Bin Lin Decl. ¶ 23.  The company does not design or manufacture any products for military use.  *See id.*

Given that Xiaomi is not owned or controlled by the People's Liberation Army, a Chinese government ministry, or an entity affiliated with China's defense industrial base, and is not affiliated with the Chinese army or a government ministry, Plaintiffs are likely to succeed on their claim that the Designation of Xiaomi was unlawful, in excess of the Department of Defense's authority under Section 1237, and in violation of the statute.

**C.     The Designation and Restrictions Violate Due Process, As Applied to Plaintiffs, Because the Government Did Not Provide Any Notice or Opportunity to Contest the Designation.**

Plaintiffs are also likely to prevail on their due process claim.  "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'"  *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).  The Supreme Court "consistently has held that some form of hearing is required before an individual is finally deprived" of a property or liberty interest.  *Id.*  Even in the national security context, "due process requires, at the least, that an affected party be informed of the

official action, be given access to the unclassified evidence on which the official actor relied and be afforded an opportunity to rebut that evidence." *Ralls Corp. v. CFIUS*, 758 F.3d 296, 319 (D.C. Cir. 2014).  Plaintiffs received nothing of the sort—no notice, no access to unclassified evidence, no opportunity to be heard.  Such complete lack of process is clearly insufficient under the Fifth Amendment.

    1. <u>The Government Was Required to Provide Due Process When Designating Xiaomi as a CCMC and Applying the Restrictions.</u>

   The Designation and Restrictions implicate Xiaomi's and the Individual Plaintiffs' constitutionally protected liberty and property interests.  Defendants were required to afford Plaintiffs due process before depriving them of these interests.  As U.S. citizens, the Individual Plaintiffs are protected by the Due Process Clause even when they are abroad.  *See, e.g.*, *Reid v. Covert*, 354 U.S. 1, 5–6 (1957) (plurality opinion).

   The Due Process Clause also applies to foreign corporations such as Xiaomi when they have "entered the territory of the United States and established substantial connections with this country."  *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 203 (D.C. Cir. 2001) [hereinafter *NCRI*]; *see also United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990).

   Xiaomi satisfies both requirements.  It has entered the United States by organizing two U.S.-headquartered subsidiaries under U.S. law, establishing an office in the United States, and selling billions of dollars in securities to U.S. investors and more than $300 million in products to American consumers.  Bin Lin Decl. ¶¶ 11–12.  Moreover, it maintains substantial ongoing business connections with U.S. businesses and individuals.  For example, in the past three years, Xiaomi has spent more than $17.8 billion on components, software, and services supplied by U.S. companies.  *See id.* ¶ 10.  These U.S. connections are clearly sufficient to trigger due process protections.  *See, e.g.*, *NCRI*, 251 F.3d at 203.

2.      The Designation and Restrictions Deprived Plaintiffs of Liberty and Property Interests Without Due Process Because They Did Not Afford Plaintiffs Any Notice or Opportunity to Be Heard.

The Designation and Restrictions "alter[] [Xiaomi's] legal status," depriving it of an existing liberty and property right to offer Securities to U.S. persons and to access U.S. capital markets. *Paul v. Davis*, 424 U.S. 693, 708 (1976); *see also Trifax Corp. v. District of Columbia*, 314 F.3d 641, 643 (D.C. Cir. 2003) ("Th[is] 'liberty concept' protects corporations as well as individuals, . . . [so] a deprivation of liberty [] triggers the procedural guarantees of the Due Process Clause."). Moreover, as a result of these actions, the Government has deprived Xiaomi of its existing contractual relationships with U.S. shareholders and financial institutions, and its ability to form future contracts. *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 572 (1972) (recognizing that the Due Process Clause protects liberty interests in the "right . . . to contract" (quoting *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923))). These actions also severely damage Xiaomi's international reputation and professional goodwill.[13] *Reeve Aleutian Airways, Inc. v. United States*, 982 F.2d 594, 598 (D.C. Cir. 1993) (acknowledging a "liberty interest in avoiding[] damage to [a company's] reputation and business caused by" stigmatizing government action).

With respect to the individual Plaintiffs, the Designation and Restrictions at a minimum implicate their property rights. Each individual Plaintiff owns Xiaomi shares or options and has property interests in those holdings. Bin Lin Decl. ¶¶ 9, 14; Peng Lin Decl. ¶ 4; English Decl. ¶ 4.

---

[13] Under the D.C. Circuit's "stigma-plus" rule, reputational harm triggers due process protections when coupled with the deprivation of "some benefit to which [the plaintiff has] a legal right," or when the "government-imposed stigma is so severe that it broadly precludes [the plaintiff] from pursuing a chosen trade or business." *Gen. Elec. Co. v. Jackson*, 610 F.3d 110, 121 (D.C. Cir. 2010) (quoting *Trifax*, 314 F.3d at 644). This rule reflects the Supreme Court's conclusion that the "alteration of legal status . . . combined with [] injury resulting from [reputational harm] justifie[s] the invocation of procedural safeguards" under the Due Process Clause. *Paul*, 424 U.S. at 708. Here, Xiaomi suffers an alteration of its legal status—and extensive resulting deprivations of liberty and property—in addition to reputational harm.

They will be prohibited from purchasing more Xiaomi Securities and will also be required to divest their existing holdings of such Securities by January 14, 2022, or face potentially draconian penalties.  *See* 50 U.S.C. § 1705 (authorizing civil penalties of up to $250,000 or twice the amount of the transaction in question for violations of orders issued under IEEPA, whichever is greater,[14] and up to a $1 million fine and/or 20-year prison term for willful violations of such orders); Exec. Order No. 13959, Preamble (invoking IEEPA).

Those government actions denying Plaintiffs their property and liberty interests cannot be upheld unless they comport with the constitutional requirements of due process.  "Due process requires notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  *United Student Aid Funds v. Espinosa*, 559 U.S. 260, 272 (2010) (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)).  How much process is due depends on (1) "the private interest that will be affected by the official action," (2) "the risk of an erroneous deprivation of such interest through the procedures used," and the likely value of additional process, and (3) "the Government's interest."  *Mathews*, 424 U.S. at 335.  Procedures that do not allow parties to "rebut the factual premises underlying [the Defendants'] action[s]" are "plainly not enough to satisfy due process," regardless of whether the Government invokes sensitive national-security concerns.  *Ralls Corp.*, 758 F.3d at 320.  For example, in *Ralls Corporation*, the D.C. Circuit held that a Presidential CFIUS order violated due process directing a corporation owned by Chinese nationals to divest American subsidiaries responsible for building windfarms in Oregon because the corporation was never "informed of the official action, . . . given access to the unclassified

---

[14] The $250,000 maximum penalty for small transactions that violate IEEPA has been inflation-adjusted and is now $307,922.  *See* 85 Fed. Reg. 19884, 19884 (Apr. 9, 2020).

evidence on which the official actor relied and . . . afforded an opportunity to rebut that evidence." *Id.* at 301–02, 319–20.

The process by which the Department of Defense designated Plaintiff Xiaomi likewise failed to satisfy the minimum requirements of due process. Defendants gave no notice that the Department of Defense was considering designating Xiaomi a CCMC under Section 1237. Instead, Plaintiffs found out with the general public that Xiaomi had been so designated. *See* Bin Lin Decl. ¶ 20. Since then, Plaintiffs have received no information from the Government regarding any factual basis for the Designation nor any opportunity to address any Government concerns or to "rebut the factual premises underlying the [agency's] action." *Ralls Corp.*, 758 F.3d at 320. As explained above, Xiaomi remains in the dark about the rationale for its Designation under Section 1237 and the materials on which that Designation was purportedly based. *See supra* p. 12. Moreover, because Section 1237 does not provide (nor have the agencies established) any procedures for challenging the Designation of Xiaomi or the application of the Restrictions to Xiaomi, Plaintiffs have no reason to believe that such rationale, materials, or hearing are forthcoming. This "lack of process constitutes a clear constitutional violation, notwithstanding [Defendants'] substantial interest in national security." *Ralls Corp.*, 758 F.3d at 320. Indeed, "however weighty the governmental interest may be in a given case, the amount of process required can never be reduced to zero—that is, the government is never relieved of its duty to provide *some* notice and *some* opportunity to be heard prior to final deprivation of a property interest." *Propert v. District of Columbia*, 948 F.2d 1327, 1332 (D.C. Cir. 1991).

Analogous D.C. Circuit precedent regarding the due process requirements for deprivation of rights of entities facing designation as foreign terrorist organizations—a designation that does not apply to Xiaomi—makes this a straightforward case. Under the Anti-Terrorism and Effective

Death Penalty Act of 1996, the Secretary of State is empowered to designate foreign terrorist organizations, which are subject to sanctions that implicate the organizations' liberty and property interests.  8 U.S.C. § 1189; *NCRI*, 251 F.3d at 196.  Like Section 1237, that statute contains a "dearth of procedural participation and protection afforded [to] the designated entity."  *NCRI*, 251 F.3d at 196.  When foreign terrorist organizations have brought due process challenges to their designations, however, the D.C. Circuit has repeatedly held that "[t]he Secretary must afford to the entities under consideration notice that the [foreign terrorist organization] designation is impending," provide to those entities "notice of those unclassified items upon which he proposes to rely" for the designation, and give them the opportunity to "rebut the administrative record or otherwise negate the proposition that they are foreign terrorist organizations."  *Id.* at 208–09; *see also Ralls Corp.*, 758 F.3d at 318; *People's Mojahedin Org. of Iran v. Dep't of State (PMOI III)*, 613 F.3d 220, 228 (D.C. Cir. 2010) (per curiam); *Chai v. Dep't of State*, 466 F.3d 125, 132 (D.C. Cir. 2006).  Xiaomi—a publicly traded consumer electronics company—and its U.S.-citizen employees are entitled at the very least to the same due process protections as designated terrorist organizations.

3.    Any Post-Deprivation Process Would Be Constitutionally Inadequate.

Defendants cannot cure the unconstitutional denial of due process here by considering at this juncture Plaintiffs' objections to the Designation of Xiaomi as a CCMC under Section 1237. Due process normally requires notice and an opportunity to be heard *before* a party is deprived of a protected interest.  *See United States v. E-Gold, Ltd.*, 521 F.3d 411, 416–17 (D.C. Cir. 2008), *abrogated on other grounds by Kaley v. United States*, 571 U.S. 320 (2014).  "There are 'extraordinary situations' that justify postponing notice and opportunity for a hearing[,]" but such situations "must be truly unusual."  *Fuentes v. Shevin*, 407 U.S. 67, 90 (1972) (quoting *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971)).  To justify postponing notice and hearing until after a

deprivation, the Government must satisfy three requirements: (1) the deprivation must be "necessary to secure an important governmental interest"; (2) there must be "a special need for very prompt action"; and (3) "the party initiating the deprivation must be a government official responsible for determining . . . that [the deprivation] was necessary and justified in the particular instance" under a narrowly drawn statute. *Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 76 (D.D.C. 2002), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003).

This case does not present any such "extraordinary situation," because Defendants cannot establish any special need for "very prompt action."  This case presents circumstances quite different from cases involving the freezing of assets of designated terrorist organizations, and not simply because Xiaomi is a consumer electronics company, not a designated terrorist organization. To prevent the imminent risk of asset flight, courts have held that the Government is not required to afford designated terrorist organizations notice and a hearing before freezing their assets.  *See, e.g.*, *Holy Land Found.*, 333 F.3d at 163–64; *Global Relief Found., Inc. v. O'Neill*, 315 F.3d 748, 754 (7th Cir. 2002); *see also, e.g.*, *Zevallos v. Obama*, 10 F. Supp. 3d 111, 127 (D.D.C. 2014), *aff'd*, 793 F.3d 106 (D.C. Cir. 2015) (designation of drug kingpin).  In the foreign-terrorist-organization context and other similar cases, courts have stressed that post-deprivation process is sufficient "given the government's compelling interest in the immediate blocking of assets upon designation" to prevent them from being "moved from the United States to elsewhere at a moment's notice." *Zevallos*, 10 F. Supp. 3d at 127, 128.  Here, there is no comparable risk that providing notice to Xiaomi before it was designated a CCMC under Section 1237 would have allowed Plaintiffs somehow to rush to raise capital from U.S. public-markets investors.  Indeed, the Executive Orders acknowledge the lack of urgency by delaying implementation of the Restrictions until 60 or 365 days after a company is designated as a CCMC, depending on the

restriction.  Exec. Order No. 13959, § 1(c).

Moreover, even if post-deprivation process would satisfy due process in this case—and it would not—Plaintiffs would still likely prevail on their due process claim because *Defendants have provided Plaintiffs with no process whatsoever.*  Even when OFAC designates Specially Designated Nationals and Blocked Persons, due process requires "notice[,] an opportunity to present evidence in written form to rebut the basis for the designation, [and the prompt provision of the] unclassified administrative record on which [OFAC] relied in taking its blocking action." *Zevallos*, 10 F. Supp. 3d at 129.  Indeed, there is a formal delisting process for Specially Designated Nationals and Blocked Persons.  *Zevallos*, 793 F.3d at 110 (citing 31 C.F.R. § 501.807).  Here, by contrast, the agencies have not established any formal process to ensure that Plaintiffs' challenges to the unlawfulness of the Designation, the lack of any accurate supporting factual material, and the lack of any lawful rationale, will be heard and considered by the Government.  Nor have Defendants provided any process for Plaintiffs to review any purported factual material, in unclassified form, on which the Designation rested and to refute such material for consideration by the Government.  *See Ralls Corp.*, 758 F.3d 319–20.

## D.      This Case Is Justiciable and Does Not Pose A Political Question.

To the extent the Government may attempt to oppose this motion for preliminary injunction or the Complaint on grounds that the case presents a non-justiciable political question, this Court should reject the argument as meritless.  The political-question doctrine creates only a "narrow" exception to the general rule that federal courts must adjudicate cases properly brought before them, and that exception applies only "where there is a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it." *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012) (quoting *Nixon v. United States*, 506 U.S. 224, 228 (1993)).

There is no "textually demonstrable" commitment in the Constitution of this issue to another branch of government.  Plaintiffs' challenges to the Designation and Restrictions are based on the Government's failure to abide by limitations imposed by Congress and the U.S. Constitution and do not require any adjudication of U.S. foreign policy towards China or any risks or opportunities of U.S. investment in Xiaomi.  Plaintiffs challenge the Defendants' actions as in excess of their statutory authority to designate Xiaomi as a CCMC under Section 1237 and to impose related restrictions on its Securities in violation of the statute, and those actions as violations of the APA and the requirements of due process.  Plaintiffs' claims "do[] not encroach on the prerogative of the political branches, do[] not require the exercise of non-judicial discretion and [are] susceptible to judicially manageable standards." *Ralls Corp.*, 758 F.3d at 314 (involving procedural due process claims); *see also Zivotofsky*, 566 U.S. at 196 (political question doctrine did not bar claim where plaintiff sought to "enforce a specific statutory right" rather than "to supplant a foreign policy decision of the political branches with the courts' own unmoored determination of what United States policy . . . should be").

D.C. Circuit jurisprudence regarding the designation of foreign terrorist organizations is instructive.  The State Department may designate a group as a foreign terrorist organization if three requirements are met:  (A) "the organization is a foreign organization"; (B) "the organization engages in terrorist activity . . . or terrorism . . . or retains the capability and intent to engage in terrorist activity or terrorism"; and (C) "the terrorist activity or terrorism of the organization threatens the security of United States nationals or the national security of the United States."  8 U.S.C. § 1189(a)(1).  Although the State Department's findings on the third requirement present a non-justiciable political question, its findings on the first two do not.  *People's Mojahedin Org. of Iran v. Dep't of State (PMOI I)*, 182 F.3d 17, 23–24 (D.C. Cir. 1999).  Here, by comparison, the

validity of the Department of Defense's authority to designate Xiaomi as a CCMC under Section 1237 requires only the straightforward factual inquiries into the ownership, control, and affiliations of Xiaomi to determine whether it meets the statutory criteria for the agency to exercise such authority.  And Plaintiffs' challenges to the Department of Defense's Designation as violative of the APA and due process do not require the Court to second-guess any "foreign policy decisions of the Executive Branch."  *Id.* at 23; *see also Ralls*, 758 F.3d at 314; *State of Washington v. U.S. Dep't of State*, 443 F. Supp. 3d 1245, 1255 (W.D. Wash. 2020) ("challenging whether federal agencies complied with the APA in promulgating" rules removing items from U.S. Munitions List did not implicate political question).

## II.    The Designation and Restriction Are Inflicting, and Will Continue to Inflict, Irreparable Harm on Plaintiffs.

Absent preliminary injunctive relief, the Designation and Restrictions will continue to inflict serious and irreparable harm on Plaintiffs during the pendency of this case.

### A.    The Designation and Restrictions Are Irreparably Harming Plaintiffs' Fifth Amendment Rights and Will Continue to Do So.

As discussed above, Plaintiffs have shown that the Designation and Restrictions violated their procedural due process rights.  *See supra* pp. 26–33.  "It has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'"  *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)).[15]  District courts in this Circuit, relying on *Mills*, have found that where a plaintiff is likely to succeed on the merits of a procedural due process claim, this deprivation of constitutional rights constitutes irreparable harm.  *See, e.g.*, *Advance Am. v. FDIC*, No. 14-CV-953 (GK), 2017 WL 2672741, at *10 (D.D.C. Feb. 23, 2017);

---

[15] Violations of the separation of powers, however, are not irreparable harm *per se*.  *E.g.*, *John Doe Co. v. CFPB*, 849 F.3d 1129, 1135 (D.C. Cir. 2017).

*Simms v. District of Columbia*, 872 F. Supp. 2d 90, 104–05 (D.D.C. 2012); *Goings v. Court Servs. & Offender Supervision Agency for D.C.*, 786 F. Supp. 2d 48, 79 (D.D.C. 2011).

**B.      The Designation and Restrictions Are Irreparably Harming Xiaomi's Business and by Extension Its Shareholders Including the Individual Plaintiffs, and Will Continue to Do So.**

The Designation and Restrictions will irreparably harm Xiaomi, and by extension its shareholders, by causing extreme and irreversible damage to Xiaomi's business, unless a preliminary injunction is entered.  These measures have already caused Xiaomi's share price to decline by 9.5 percent at a time when competitor firms' share prices have soared.  *See* Bin Lin Decl. ¶ 30.  As of March 15, these harms will drastically accelerate, as U.S. persons will not be allowed to purchase Xiaomi Securities, which will largely cut off Xiaomi's access to the capital it needs from the U.S. financial markets to remain competitive, diminishing its market share, causing lasting damage to its brand reputation and goodwill in the marketplace, and seriously hampering its ability to recruit and retain talent.

*Access to capital and other business opportunities.*  To remain competitive in the highly competitive global smartphones, consumer internet of things, and internet services industries, Xiaomi must continue to grow rapidly and to upgrade constantly its existing product offerings. Bin Lin Decl. ¶ 25.  Xiaomi's rapid growth to date has been fueled in part by billions of dollars of outside investment, including from U.S. investors.  *Id.* ¶¶ 25–26.  For example, in 2020 alone, Xiaomi raised approximately $4.5 billion through the issuance of U.S.-dollar-denominated bonds, convertible bonds, and common shares.  *Id.* ¶ 12.  Approximately one-third of this total was placed with U.S. investors.  *Id.*  Beginning on March 15, however, the Restrictions will largely cut off Xiaomi's access to new investment from U.S. capital markets, depriving the company of funds it could use to pursue research and development ("R&D") and to pursue strategic transactions, including acquisitions of other businesses.  *Id.* ¶ 26.  Moreover, the significant reduction in the

market value of Xiaomi's ordinary shares triggered by the Designation, along with the extent to which the Restrictions have made Xiaomi shares unattractive (and indeed, as of March 15, unusable) as a means of purchasing companies or assets from U.S. persons, already has caused Xiaomi to abandon one transaction to acquire a major new business—leaving the potential target open to be acquired by one of Xiaomi's competitors. *Id.* ¶ 27. These adverse effects on Xiaomi's long-term business prospects constitute irreparable harm. *See Mylan Pharm., Inc. v. Shalala*, 81 F. Supp. 2d 30, 43 (D.D.C. 2000) ("[C]ourts have found irreparable harm where the movant has made a strong showing that the economic loss would significantly damage its business above and beyond a simple diminution in profits.") (collecting cases).

**Loss of market share.** As Xiaomi curbs its R&D spending and withdraws from the market for strategic acquisitions, competitors not subject to the Restrictions are more than likely to step up and take its place. Bin Lin Decl. ¶¶ 27–31. Even if the Designation and Restrictions were to be reversed later, Xiaomi would not be able to make up the ground lost to competitors and lost business opportunities would not resurface again. *Id.* ¶ 31. It is well-established that this sort of loss of market share to a competitor constitutes irreparable harm. *Bayer HealthCare, LLC v. U.S. Food & Drug Admin.*, 942 F. Supp. 2d 17, 26 (D.D.C. 2013) ("Courts have recognized that price erosion and diminished market share can constitute irreparable harm.") (collecting cases); *see, e.g.*, *TikTok Inc. v. Trump*, No. 1:20-CV-02658 (CJN), 2020 WL 5763634, at *8 (D.D.C. Sept. 27, 2020) (holding that the operator of a video-sharing application, and its Chinese parent company, demonstrated that they would suffer "irreparable economic and reputational harm" where the Secretary of Commerce prohibited certain transactions that would ultimately erode the app's competitive position and its attractiveness as a commercial partner).

***Harms to business reputation and goodwill.***   Being designated by the Department of Defense as a "Communist Chinese military company" under Section 1237 will undoubtedly harm Xiaomi's brand reputation and goodwill in the marketplace, as well as its efforts to sell its products internationally.  Bin Lin Decl. ¶ 32; *Armour & Co. v. Freeman*, 304 F.2d 404, 406 (D.C. Cir. 1962) (irreparable harm where defendant's conduct "could not fail to damage [plaintiff's] good name").  The measures have also undermined confidence in the marketplace regarding Xiaomi's ability to operate its business, leading to rumors that its business partners will cut ties with the company.  Bin Lin Decl. ¶ 32.  Indeed, Xiaomi was recently forced to refute a rumor that a major U.S. technology company would stop supporting Xiaomi phones.  *Id.*  It is well established that loss of "customer trust and goodwill" constitutes irreparable harm.  *See, e.g.*, *Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 77 (D.D.C. 2001).

***Difficulty recruiting and retaining talent.***   As a consumer electronics company, Xiaomi relies on, invests heavily in, and competes aggressively to recruit talented engineers, industrial designers, and other employees.  *See* Bin Lin Decl. ¶ 33.  Epitomizing the importance of recruiting for Xiaomi, Bin Lin and other senior executives personally spend a significant percentage of their time recruiting senior engineers and scientists.  *Id.*  The Designation and Restrictions have already hampered these recruiting efforts by damaging Xiaomi's international branding and corporate goodwill and creating uncertainty about the company's future business prospects.  *Id.*  Indeed, since the Designation, two potential senior recruits have stated that they are unwilling to join Xiaomi because of the measures the U.S. Government has taken against the company.  *Id.*

Moreover, the Designation and Restrictions are interfering with Xiaomi's efforts to retain the talent it has already recruited.  Given that the Designation and Restrictions have driven down Xiaomi's share price, they have reduced the value of stock options and restricted stock units

granted to Xiaomi employees, and reduced many of Xiaomi's employees' incentives to remain with the company until their options or shares vest.  *Id.* ¶ 34.  Xiaomi's share price will in all likelihood remain depressed, due to the elimination of demand for those shares from U.S. persons. This interference with Xiaomi's ability "to recruit and retain employees to build—or even maintain—its business" likewise supports the conclusion that the Designation and Restrictions have caused Xiaomi irreparable harm.  *See, e.g.*, *TikTok*, 2020 WL 5763634, at *8.

    ***Unrecoverable monetary losses.***  The Designation and Restrictions already have caused Xiaomi to suffer grave economic losses, and will continue to do so if their implementation and enforcement is not enjoined pending resolution of this action.  Since the announcement of the Designation and Restrictions, Xiaomi's stock price has decreased by 9.5 percent as of February 16, 2021, and its market capitalization declined by approximately $10 billion.  Bin Lin Decl. ¶ 30. Xiaomi's share price is likely to continue to decline (or at least to remain depressed) if the Restrictions are not enjoined.  *See id.* ¶¶ 29–31.

    These losses are reason alone to conclude that Xiaomi is suffering and will continue to suffer irreparable harm.  In general "economic loss does not, in and of itself, constitute irreparable harm."  *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).  But that rule does not hold true when economic losses are unrecoverable, such as when—as here—sovereign immunity bars claims for damages.  *See* 5 U.S.C. § 702; *see, e.g.*, *Nat'l Min. Ass'n v. Jackson*, 768 F. Supp. 2d 34, 52–53 (D.D.C. 2011).  Courts in this district have not spoken with a uniform voice as to whether unrecoverable economic losses are irreparable *per se* (provided they are "imminen[t]"), *e.g.*, *Feinerman v. Bernardi*, 558 F. Supp. 2d 36, 50–51 (D.D.C. 2008), or whether the movant must also show, for example, that the losses are "significant," *e.g.*, *Air Trans. Ass'n of Am., Inc. v. Export-Import Bank*, 840 F. Supp. 2d 327, 335 (D.D.C. 2012), "serious," *e.g.*, *ViroPharma, Inc.*

*v. Hamburg*, 898 F. Supp. 2d 1, 26 (D.D.C. 2012), or "severe," *e.g.*, *Save Jobs USA v. DHS*, 105 F. Supp. 3d 108, 115 (D.D.C. 2015).  But the Court need not resolve that question in this case, because Xiaomi's economic losses constitute irreparable harm no matter how the Court defines it. *See District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 37–38 (D.D.C. 2020).

### C.   The Designation and Restrictions Will Cause the Individual Plaintiffs to Suffer Irreparable Harm.

The individual Plaintiffs will be irreparably harmed by the Restrictions, which will prohibit them from purchasing additional Xiaomi publicly traded Securities as of March 15, 2021 (including prohibiting them from realizing the economic benefits of share-based benefit awards they have received and would, but for the Restrictions, expect to continue to receive) and will require them to divest their publicly traded Xiaomi shares by January 14, 2022.

***Plaintiff Bin Lin*** would be required to sell billions of dollars of Xiaomi publicly traded shares at a time when the price of those shares is significantly lower than it would be in the absence of the Designation and Restrictions.   Bin Lin Decl. ¶ 35.   So long as the Designation and Restrictions remain in place, Bin Lin will be unable to benefit from any future appreciation in the price of those shares.  *Id.*  Given that Bin Lin will face significant, unrecoverable losses should the Restrictions take effect, he is "likely to suffer at least some degree of irreparable injury absent preliminary injunctive relief."  *Feinerman*, 558 F. Supp. 2d at 50–51.  Moreover, insofar as the Restrictions are deemed to apply to Bin Lin's Class A shares, the forced sale of those shares would result in the permanent elimination of the enhanced voting rights attached to those shares, as those shares would be automatically and irretrievably converted into Class B shares upon their sale.  Bin Lin Decl. ¶ 13.  Bin Lin would be emotionally "devastat[ed]" if he were forced to dispose of his shareholdings in the company he co-founded and has spent the last decade developing from infancy to multinational success.  *Id.* ¶ 35.

*Plaintiffs Peng Lin and Stephen Sean English* would be irreparably harmed if the Designation were maintained and the Restrictions take effect.  Both Peng Lin and Stephen Sean English own Xiaomi publicly traded shares and would be required to divest those holdings (and be prohibited from acquiring additional shares) if the Restrictions take effect.  Peng Lin Decl. ¶¶ 4–5; English Decl. ¶¶ 4–5.  As employees of Xiaomi since 2016, they have been beneficiaries of the Xiaomi Corporation employee benefit plan, which regularly awards employees Xiaomi stock options and restricted stock units.  This benefit plan is a meaningful part of their compensation, was important to them when deciding whether to join the company, and has remained an important reason why they have stayed with the company.  Peng Lin Decl. ¶ 3; English Decl. ¶ 3.  As of March 15, 2021, however, they will no longer be permitted to receive awards of Xiaomi stock.  Peng Lin Decl. ¶ 5; English Decl. ¶ 5.  Both Peng Lin and Stephen Sean English also currently hold awarded but unvested awards of shares and options.  Peng Lin Decl. ¶ 4; English Decl. ¶ 4.  Insofar as the Restrictions apply to the vesting of granted but unvested share awards, these two employees would be required to forfeit their unvested awards.

## III.    The Balance of the Equities and the Public Interest Support A Preliminary Injunction.

The last two steps of the preliminary injunction analysis—the balance of the equities and the public interest—likewise cut in Plaintiffs' favor.  In balancing the equities, the court "weighs the harm to [Plaintiffs] if there is no injunction against the harm to [Defendants] if there is." *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016).   And where the Government is the opposing party, the Government's interest and the public interest merge.  *Id.* (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  Here, there would be significant harm to Plaintiffs if a preliminary injunction were denied, but the harm to the Government from issuing such an injunction would be slight at best.

As explained above, Plaintiffs would be severely harmed by the denial of a preliminary injunction.  *See supra* pp. 35–41.  On the other side of the scale, there is little to offset these harms.  "There is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (collecting cases).  "To the contrary, there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'"  *Id.* (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)).  Regardless of whether the Government has a substantial interest in enforcing sanctions against properly designated CCMCs, there is nothing to demonstrate that the Government would be harmed, or the public interest benefited, by preventing U.S. persons from transacting in and possessing Xiaomi Securities.  Nor would the public interest be served by allowing Defendants to dispense with the procedural requirements of the Fifth Amendment and APA.  *See Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("[E]nforcement of an unconstitutional law is always contrary to the public interest.  The Constitution does not permit Congress to prioritize any policy goal over the Due Process Clause." (citations omitted)).

Meanwhile, the risk of hardship to the Government from delaying implementation or enforcement of the Designation and Restrictions against Xiaomi while this case is adjudicated is slight.  The Department of Defense did not publish a list of CCMCs for more than 20 years after Section 1237 was enacted, and the Trump Administration designated Xiaomi more than two months after announcing the Restrictions.  Moreover, as a logistical matter, it would be simple for Defendants, by issuing a temporary license or otherwise, to delay implementation of these measures pending the conclusion of this case without revoking the existing Designations or Restrictions.  In fact, Department of the Treasury has recently done just this for companies whose

names "closely match[], but do[] not exactly match, the name[s] of . . . [CCMCs]," which are exempt from the Requirements until May 27, 2021.  Off. of Foreign Assets Control, Dep't of the Treasury, General License No. 1A Authorizing Transactions Involving Securities of Certain Communist Chinese Military Companies (Jan. 26, 2021), *available at* https://home.treasury.gov/system/files/126/ccmc_gl1a_01272021_1.pdf.

Because the harm to Plaintiffs from maintaining the Designation and implementing the Restrictions against Xiaomi vastly outweigh any harm to the Government from a preliminary injunction, this final requirement for the issuance of such an injunction is more than satisfied. *Nw. Immigrant Rights Proj. v. U.S. Citizenship & Immigration Servs.*, No. 19-CV-3283 (RDM), 2020 WL 5995206, at *32 (D.D.C. Oct. 8, 2020), *appeal dismissed*, No. 20-5369, 2021 WL 161666 (D.C. Cir. Jan. 12, 2021).

## CONCLUSION

Plaintiffs respectfully urge the Court to grant this motion and to issue as soon as possible, and in all events before the Restrictions go into effect on March 15, 2021, a preliminary injunction against enforcement or implementation of the Designation or Restrictions as applied to Xiaomi's Securities.

DATED: February 17, 2021        Respectfully submitted,

                        */s/ John E. Hall*
                        John E. Hall (D.C. Bar. No. 415364)
                        Beth S. Brinkmann (D.C. Bar. No. 477771)
                        Alexander A. Berengaut (D.C. Bar. No. 989222)
                        Megan A. Crowley (D.C. Bar. No. 1049027)
                        COVINGTON & BURLING LLP
                        One CityCenter
                        850 Tenth Street, NW
                        Washington, DC 20001
                        Telephone: +1 (202) 662-6000
                        Facsimile: + 1 (202) 778-6000
                        Email:  jhall@cov.com
                        bbrinkmann@cov.com

aberengaut@cov.com
mcrowley@cov.com

S. Conrad Scott (*pro hac vice* forthcoming)
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
Telephone: +1 (212) 841-1000
Facsimile: +1 (212) 841-1010
Email: cscott@cov.com

*Attorneys for Plaintiffs*