**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

XIAOMI CORPORATION, *et al.*,

        Plaintiffs,

    v.

U.S. DEPARTMENT OF DEFENSE, *et al.*,

        Defendants.

Civil Docket No. 21-cv-00280 (RC)

**<u>DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION</u>**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................ 2

    I.     Longstanding United States Concerns Over Chinese Military-Civil
          Integration ....................................................................................................... 2

    II.    Statutory Background........................................................................................ 4

          A.     Historical Overview .................................................................................. 4

          B.     International Emergency Economic Powers Act ("IEEPA")..................... 5

          C.     Section 1237 of the National Defense Authorization Act for Fiscal
                Year 1999, as Amended ............................................................................ 6

          D.     Executive Order No. 13959, as Amended ................................................ 7

    III.   Factual Background and Procedural History ..................................................... 9

STANDARD OF REVIEW .............................................................................................. 11

ARGUMENT .................................................................................................................... 12

    I.     Plaintiffs Are Not Likely To Succeed on Their Administrative Procedure
          Act Claims. ..................................................................................................... 13

    II.    Plaintiffs Are Not Likely To Succeed on Their Due Process Claim. .................. 18

    III.   Plaintiffs Have Not Established Certain, Imminent Irreparable Harm
          Justifying a Preliminary Injunction ................................................................. 23

    IV.   The Balance of the Equities and Public Interest Strongly Favor the
          Government....................................................................................................... 27

CONCLUSION .................................................................................................................. 29

# TABLE OF AUTHORITIES

**Cases**

*Air Transport Ass'n of Am., Inc. v. Export-Import Bank of the U.S.*,
  840 F. Supp. 2d 327 (D.D.C. 2012) ...............................................................................25

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
  526 U.S. 40 (1999) .......................................................................................................18

*Am. Wildlands v. Kempthorne*,
  530 F.3d 991 (D.C. Cir. 2008) .....................................................................................15

*Aviles-Wynkoop v. Neal*,
  978 F. Supp. 2d 15 (D.D.C. 2013) ................................................................................24

*Bd. of Regents v. Roth*,
  408 U.S. 564 (1972) .......................................................................................................21

*Cal. Ass'n of Priv. Postsecondary Schs. v. Devos*,
  344 F. Supp. 3d 158 (D.D.C. 2018) ........................................................................25, 26

*Califano v. Yamasaki*,
  442 U.S. 682 (1979) .......................................................................................................23

*Capogrosso v. Gelbstein*,
  18-cv-2710 (MKB)(LB), 2019 WL 6406444 (E.D.N.Y. Jan. 30, 2019)..................20, 21

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) .......................................................................................................13

*City of Dania Beach v. FAA*,
  628 F.3d 581 (D.C. Cir. 2010) .....................................................................................15

*CityFed Fin. Corp. v. Off. of Thrift Supervision*,
  58 F.3d 738 (D.C. Cir. 1995) ...................................................................................12, 23

*Cobell v. Norton*,
  391 F.3d 251 (D.C. Cir. 2004) .....................................................................................12

*Coal. for Common Sense in Gov't Procurement v. United States*,
  576 F. Supp. 2d 162 (D.D.C. 2008) ..............................................................................25

*Cornish v. Dudas*,
  540 F. Supp. 2d 61 (D.D.C. 2008) ................................................................................24

*Dames & Moore v. Regan*,
  453 U.S. 654 (1981) ........................................................................................................4

*Def. Distributed v. Dep't of State*,
  838 F.3d 451 (5th Cir. 2016)........................................................................................29

*Econ. Rsch. Servs., Inc. v. Resolution Econ., LLC*,,
  140 F. Supp. 3d 47 (D.D.C. 2015) ...............................................................................25

*Elec. Priv. Info. Ctr. v. U.S. Dep't of Justice*,
  15 F. Supp. 3d 32 (D.D.C. 2014) .................................................................................23

*Figg Bridge Eng'rs, Inc. v. Fed. Highway Admin.*,
  No. 20-cv-2188 (CKK), 2020 WL 4784722 (D.D.C. Aug. 17, 2020) ..........................25

*Fla. Power & Light Co. v. Lorion*,
  470 U.S. 729 (1985) ......................................................................................................13

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) ......................................................................................................17

*Greene v. McElroy*,
  360 U.S. 474 (1959) ......................................................................................................20

*Holder v. Humanitarian Law Project*,
  561 U.S. 1 (2010) ....................................................................................................14, 29

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
  219 F. Supp. 2d 57 (D.D.C. 2002),
  *aff'd*, 333 F.3d 156 (D.C. Cir. 2003)..........................................................14, 17, 18, 28

*In re Navy Chaplaincy*,
  738 F.3d 425 (D.C. Cir. 2013) .....................................................................................12

*Islamic Am. Relief Agency v. Gonzales*,
  477 F.3d 728 (D.C. Cir. 2007) .....................................................................................14

*Jack's Canoes & Kayaks, LLC v. Nat'l Park Serv.*,
  933 F. Supp. 2d 58 (D.D.C. 2013) ..........................................................................11, 12

*Jackson v. Heh*,
  215 F.3d 1326 (Table) (6th Cir. 2000) .........................................................................20

*Kartseva v. Dep't of State*,
  37 F.3d 1524 (D.C. Cir. 1994) .....................................................................................20

iii

*League of Women Voters v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) ................................................................................23

*Mead Johnson Pharm. Grp. v. Bowen*
  655 F. Supp. 53 (D.D.C. 1986), *aff'd*, 838 F.2d 1332 (D.C. Cir. 1988) ......................24

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ...........................................................................................13

*Nat'l Council of Resistance of Iran v. Dep't of State*,
  251 F.3d 192 (D.C. Cir. 2001) ..........................................................................18

*Nat'l Mining Ass'n v. Jackson*,
  768 F. Supp. 2d 34 (D.D.C. 2011) .....................................................................25

*Nken v. Holder*,
  556 U.S. 418 (2009) ....................................................................................12, 27

*Orvis v. Brownell*,
  345 U.S. 183 (1953) ...........................................................................................4

*Propper v. Clark*,
  337 U.S. 472 (1949) ...........................................................................................4

*Ralls Corp. v. Comm. on Foreign Inv. in U.S.*,
  758 F.3d 296 (D.C. Cir. 2014) ..........................................................................18

*Regan v. Wald*,
  468 U.S. 222 (1984) ...........................................................................................5

*Rodriguez v. Margotta*,
  71 F. Supp. 2d 289 (S.D.N.Y. 1999) ..................................................................20

*Sampson v. Murray*,
  415 U.S. 61 (1974) ...........................................................................................23

*Singh v. Carter*,
  185 F. Supp. 3d 11 (D.D.C. 2016) .....................................................................12

*Small Refin. Lead Phase-Down Task Force v. EPA*,
  705 F.2d 506 (D.C. Cir. 1983) ..........................................................................17

*Taylor v. Resol. Tr. Corp.*,
  56 F.3d 1497 (D.C. Cir. 1995) ..........................................................................20

*Trifax Corp. v. District of Columbia,
    314 F.3d 641 (D.C. Cir. 2003) ......................................................................20

Verma v. U.S. Citizenship & Immigration Serv.,
    No. 20-cv-3419 (RDM), 2020 WL 7495286 (D.D.C Dec. 18, 2020) ....................23, 27

Winter v. Natural Res. Def. Council, Inc.,
    555 U.S. 7 (2008) .......................................................................11, 12, 28

*Wis. Gas Co. v. FERC,
    758 F.2d 669 (D.C. Cir. 1985) ................................................................ passim

Zarmach Oil Servs., Inc. v. U.S. Dep't of the Treasury,
    750 F. Supp. 2d 150 (D.D.C. 2010) .............................................................14

Zevallos v. Obama,
    10 F. Supp. 3d 111 (D.D.C. 2014) ..................................................14, 17, 18

**Constitutional Provisions**

U.S. Const. amend. V..........................................................................................18

**Statutes**

5 U.S.C. § 706.............................................................................................13, 18

22 U.S.C. § 7002..............................................................................................3

50 U.S.C. § 1701...............................................................................................5

50 U.S.C. § 1702............................................................................................5, 6

50 U.S.C. § 1703...............................................................................................5

50 U.S.C. § 1704...............................................................................................5

50 U.S.C. § 1705...............................................................................................5

50 U.S.C. § 1706...............................................................................................5

50 U.S.C. § 4305...............................................................................................4

FY 2001 NDAA, Pub. L. No. 106-398, 114 Stat. 1654 (2000) ............................3, 4, 7, 28

FY21 NDAA, Pub. L. No. 116-283, 134 Stat. 3388, 3965-66 (2021)...............................4

v

National Defense Authorization Act for FY 1999, Pub. L. No. 105-261,
112 Stat. 2160 (Oct. 17, 1998) ............................................................................3, 6, 7, 28

Pub. L. No. 107-56, 115 Stat. 272 (2001) ..........................................................................6

Pub. L. No. 108-375 ............................................................................................................7

Trading With the Enemy Act, 40 Stat. 411 (1917), codified as amended at 50 U.S.C. §
4301 *et seq.* ...................................................................................................................4

**Rules**

LCvR 7(n) ...........................................................................................................................17

**Executive Orders**

E.O. No. 13974, 86 Fed. Reg. 4875 (Jan. 19, 2021) .................................................1, 9, 26

Blocking Assets & Prohibiting Transactions with Significant Narcotics Traffickers,
Exec. Order No. 12978, 60 Fed. Reg. 54579 (Oct. 21, 1995) .........................................6

Blocking Property of Additional Persons Contributing to the Situation in Ukraine,
Exec. Order No. 13661, 79 Fed. Reg. 15535 (Mar. 16, 2014) .........................................5

Securities Investments That Finance Communist Chinese Military Companies,
Exec. Order No. 13959, 85 Fed. Reg. 73185 (Nov. 17, 2020) .............................. *passim*

**Other Authorities**

Merriam-Webster, affiliated (adj.), https://www.merriam-
webster.com/dictionary/affiliated#learn-more .............................................................16

*Military-Civil Fusion and the People's Republic of China*, U.S. Department of State,
https://www.state.gov/wp-content/uploads/2020/05/What-is-MCF-
One-Pager.pdf .........................................................................................................14, 15

OED, affiliated (adj.), https://www.oed.com/view/Entry/3404?rskey=CNrhfW&
result=2&isAdvanced=false#eid ..................................................................................16

Office of the Sec'y of Def., Annual Rep. to Congress: Military and Sec. Devs.
Involving the PRC, https://china.usc.edu/sites/default/files/article/attachments/2011_
CMPR_Final.pdf .............................................................................................................3

Office of the Sec'y of Def., Annual Rep. to Congress: Military and Sec. Devs. Involving
the PRC (2020), https://media.defense.gov/2020/Sep/01/2002488689/-1/-1/1/2020-
DOD-CHINA-MILITARY-POWER-REPORT-FINAL.PDF .........................................3

Qualifying Entities Prepared in Response to Section 1237 of the National Defense
Authorization Act for Fiscal Year 1999 (PUBLIC LAW 105-261),
https://media.defense.gov/2021/Jan/14/2002565154/-1/-1/0/DOD-RELEASES-LIST-
OF-ADDITIONAL-COMPANIES-IN-ACCORDANCE-WITH-SECTION-1237-OF-
FY99-NDAA.PDF ...........................................................................................................9

Remarks by President Biden on America's Place in the World (Feb. 4, 2021),
https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/02/04/remarks-
by-president-biden-on-americas-place-in-the-world........................................................4

S. Rep. No. 95-466, 1977 U.S.C.C.A.N. 4540, codified at 50 U.S.C. §§ 1701-1706 .........5

The U.S.-China Economic and Security Review Commission, 2018 Annual Report, –
Emerging Technologies and Military-Civil Fusion: Artificial Intelligence, New
Materials, and New Energy, https://www.uscc.gov/sites/default/files/2019-11/
Chapter%203%20Section%202%20-%20Emerging%20Technologies%
20and%20Military-Civil%20Fusion%20-%20Artificial%20Intelligence,%20New%
20Materials,%20and%20New%20Energy.pdf.....................................................3, 4, 15

## INTRODUCTION

For over two decades, Congress and the President have been concerned about the interactions between nominally independent Chinese corporations and the Chinese government and military. Since 1999, Congress has directed the President to identify certain entities as Communist Chinese military companies ("CCMCs") and authorized the President to impose sanctions against those entities. Last year, in addition to the long-established Congressional acknowledgement of the threat posed by CCMCs, the President independently found that the People's Republic of China's ("PRC's") "military-industrial complex" "constitutes an unusual and extraordinary threat . . . to the national security, foreign policy, and economy of the United States" by "by directly supporting the efforts of the PRC's military, intelligence, and other security apparatuses." Addressing the Threat from Securities Investments That Finance Communist Chinese Military Companies, Exec. Order ("E.O.") No. 13959, 85 Fed. Reg. 73185 (Nov. 17, 2020) ("E.O. 13959").

The President directed that U.S. persons were forbidden to transact in publicly traded securities of companies listed as "Communist Chinese military companies" sixty days after the Secretaries of Defense or Treasury made such a listing determination. *Id.* §§ 1, 4(a). The President subsequently amended E.O. 13959 to require U.S. persons to fully divest such securities one year after said listing. E.O. No. 13974 § 1, 86 Fed. Reg. 4875 (Jan. 19, 2021). On January 14, the Department of Defense ("DoD") listed Plaintiff Xiaomi as a CCMC. It did so because the company's high-technology activities and relationship with the Chinese state, and hence the Communist Party of China, indicated that it was affiliated with the Chinese defense industrial base.

This case presents the narrow question of whether Xiaomi was properly listed as a CCMC pursuant to the specific requirements of E.O. 13959, as amended. Plaintiffs, Xiaomi itself and

three individual shareholders, bring suit, asserting that the Government's activities violate the Administrative Procedure Act and the Due Process Clause, and that they are thus entitled to preliminary injunctive relief. They cannot make the showings required for that relief. With respect to the APA claim, DoD's listing was rational and supported by evidence. And its activities comported with due process: Xiaomi cannot show a liberty interest in issuing publicly-traded securities to certain people, or having publicly-traded securities possessed by certain people, nor can the individual plaintiffs show a property right in future transactions of Xiaomi securities. Absent such a liberty interest or property right, there can be no due process violation. And even to the extent that the individual plaintiffs will be required to divest their currently held securities in 2022, such injury is not "imminent" as is required for preliminary relief.

Nor can Plaintiffs demonstrate irreparable injury. Their claims of injury are essentially economic. But economic injury, even against the Government, reflects harm for which there is quintessentially a remedy at law; such injury must be severe, if not threatening the existence of the entity to warrant injunctive relief. Plaintiffs cannot make such a showing. Moreover, the balance of the equities are in favor of the Government particularly where both Congress and the President have recognized the grave national security interests that are at stake.

## BACKGROUND

## I.     Longstanding United States Concerns Over Chinese Military-Civil Integration

The United States Government has long expressed significant concerns over the national security threat posed by the interrelationship between Chinese technology companies and the Chinese state. In the FY 1999 National Defense Authorization Act ("NDAA"), Congress directed the President to identify entities that meet the statutory criteria of CCMCs, and has authorized the President to issue IEEPA sanctions against them even without a declaration of national emergency.

*See* National Defense Authorization Act for FY 1999 ("FY99 NDAA"), § 1237(a), b), Pub. L. 105-261, 112 Stat. 2160 (Oct. 17, 1998).   This concern continued into this decade.  For example, in its 2011 Annual Report to Congress, the Department of Defense acknowledged that "China's defense industry has benefited from integration with a rapidly expanding civilian economy and science and technology sector, particularly elements that have access to foreign technologies."  Office of the Sec'y of Def., Annual Rep. to Congress: Military and Sec. Devs. Involving the PRC, at 42 (2011) ("2011 DoD Annual Rep.").[1]  "Information technology companies in particular . . . maintain close ties to the [People's Liberation Army]."  *Id.*  A decade later, these concerns had not changed, with DoD recognizing that China's strategy seeks to "fuse[] . . . China's defense industrial base and its civilian technology and industrial base."  Office of the Sec'y of Def., Annual Rep. to Congress: Military and Sec. Devs. Involving the PRC, at 18 (2020) ("2020 DoD Annual Rep.").[2]  The U.S.-China Economic and Security Review Commission ("U.S.-China Commission")[3] has articulated similar concerns, noting that "[t]he Chinese government's military–civil fusion policy aims to spur innovation and economic growth through an array of policies . . . while leveraging the fruits of civilian innovation for China's defense sector."  *See* U.S.-China Economic & Security Review Comm'n, 2018 Annual Report, Chap. 3 § 2 – Emerging Technologies and Military-Civil Fusion: Artificial Intelligence, New Materials, and New Energy ("U.S. China Comm'n 2018 Rpt.").[4]

---

[1] *Available at:* https://china.usc.edu/sites/default/files/article/attachments/2011_CMPR_Final.pdf

[2] https://media.defense.gov/2020/Sep/01/2002488689/-1/-1/1/2020-DOD-CHINA-MILITARY-POWER-REPORT-FINAL.PDF.

[3] The U.S.-China Commission, established by statute in the 2001 NDAA, Pub. L. No. 106-398, 114 Stat. 1654 (2000), is intended "to monitor, investigate, and report to Congress on the national security implications of the bilateral trade and economic relationship between the United States and the People's Republic of China [PRC]."  22 U.S.C. § 7002(b)(2).

[4] https://www.uscc.gov/sites/default/files/2019-11/Chapter%203%20Section%202%20-%20Emerging%20Technologies%20and%20Military-Civil%20Fusion%20-%20Artificial%20Intelligence,%20New%20Materials,%20and%20New%20Energy.pdf.

These concerns animate current bipartisan policy, including the National Defense Authorization Act for FY 2021 ("FY21 NDAA"), where Congress required the Secretary of Defense to publicly identify "Chinese military compan[ies]."  *See* FY21 NDAA § 1260H, Pub. L. No. 116-283, 134 Stat. 3388, 3965-66 (2021).  The current administration's views are consistent with this approach, which represents more than two decades of concern among the Legislative and Executive Branches over this issue.  *Cf. generally* Remarks by President Biden on America's Place in the World (Feb. 4, 2021)[5]; *see also* FY99 NDAA § 1237(b) (embodying similar concern about CCMCs).

## II.     Statutory Background

### A.     Historical Overview

For nearly its entire history, the United States has utilized economic sanctions as a tool in its foreign policy and national security arsenals.  During most of the twentieth century, U.S. sanctions programs were governed by the Trading With the Enemy Act ("TWEA"), enacted in 1917.  *See* 40 Stat. 411 (codified as amended at 50 U.S.C. § 4301 *et seq*.).  As amended in 1933, TWEA granted the President "broad authority" to "investigate, regulate . . . prevent or prohibit . . . transactions" in times of war or declared national emergencies.  *See* 50 U.S.C. § 4305(b)(1); *Dames & Moore v. Regan*, 453 U.S. 654, 672 (1981).  TWEA conveyed to the Executive Branch the authority to regulate, prevent, or prohibit transactions, which has been consistently interpreted to encompass the power to block or freeze a person's property.  *See, e.g.*, *Orvis v. Brownell*, 345 U.S. 183, 187-88 (1953); *Propper v. Clark*, 337 U.S. 472, 483-84 (1949).

---

[5] https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/02/04/remarks-by-president-biden-on-americas-place-in-the-world/.

### B.   International Emergency Economic Powers Act ("IEEPA")

In 1977, Congress amended TWEA and enacted IEEPA. *See* S. Rep. No. 95-466, at 2 (1977), reprinted in 1977 U.S.C.C.A.N. 4540, 4541, codified at 50 U.S.C. §§ 1701-1706. IEEPA extended the President's authority to declare national emergencies, while TWEA's application was limited to periods of declared wars. *See Regan v. Wald*, 468 U.S. 222, 227-28 (1984). Although the broad authorities granted to the President under IEEPA remain essentially the same as those under TWEA, with certain limited exceptions, *see id.* at 228, IEEPA requires the President to declare a national emergency "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States," *see* 50 U.S.C. § 1701(a). Once such a national emergency is declared, IEEPA authorizes the President to:

> [D]irect and compel, nullify, void, prevent or prohibit, any . . . transfer . . . of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest . . . with respect to any property, subject to the jurisdiction of the United States . . . .

*Id.* § 1702(a)(1)(B).

Pursuant to this expansive authority, Presidents have designated persons under sanctions programs based on IEEPA in response to a variety of declared national emergencies. *See, e.g.*, Blocking Property of Additional Persons Contributing to the Situation in Ukraine, Exec. Order No. 13661, 79 Fed. Reg. 15535 (Mar. 16, 2014) (blocking assets of persons determined "to be owned or controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly . . . a senior official of the Government of the Russian Federation" after finding that government's actions and policies with respect to Ukraine "constitute an unusual and extraordinary threat to the national security and foreign policy of the United States"); Blocking Assets & Prohibiting Transactions with Significant Narcotics Traffickers, Exec. Order No. 12978, 60 Fed. Reg. 54579

(Oct. 21, 1995) (blocking assets of persons who "play a significant role in international narcotics trafficking centered in Colombia").

In October 2001, Congress amended IEEPA through passage of the United and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001. Among other things, the amendments provided that, in case of judicial review of an IEEPA-based blocking designation, an agency record containing classified information "may be submitted to the reviewing court ex parte and in camera." *See* 50 U.S.C. § 1702(c), added by Pub. L. No. 107-56, § 106, 115 Stat. 272, 278 (2001).

### C.   Section 1237 of the National Defense Authorization Act for Fiscal Year 1999, as Amended

Section 1237 of the National Defense Authorization Act for Fiscal Year 1999, as amended, authorizes the President to exercise IEEPA authorities against "Communist Chinese military companies" without the need for a declaration of national emergency that is typically required for IEEPA regulation. *See* NDAA, FY99 § 1237(a)(1), Pub. L. No. 105-261, 112 Stat. 1920, 2161 (1998). The NDAA requires the Secretary of Defense to "make a determination of those persons operating directly or indirectly in the United States or any of its territories and possessions that are Communist Chinese military companies[.]" *Id.* § 1237(b)(1). This provision also requires the Department of Defense to publish a list of those persons in the Federal Register, and make annual revisions to the list. *Id.* at § 1237(b)(2). When formulating the list, the Department of Defense must consult with the Attorney General, the Director of Central Intelligence, and the Director of the Federal Bureau of Investigation. *Id.* at § 1237(b)(3). Further, the Department of Defense must provide this list to the Committee on Armed Services of the U.S. House of Representatives, the Committee on Armed Services of the U.S. Senate, the Secretary of State, the Secretary of the

Treasury, the Attorney General, the Secretary of Commerce, the Secretary of Energy, and the Director of the Central Intelligence Agency. *Id.* at § 1237(b)(1).

As amended, Section 1237 defines the term "Communist Chinese military company," in relevant part, as any person that "(i) is owned or controlled by, or affiliated with, the People's Liberation Army or a ministry of the government of the People's Republic of China or that is owned or controlled by an entity affiliated with the defense industrial base of the People's Republic of China; and (ii) is engaged in providing commercial services, manufacturing, producing, or exporting." NDAA, FY99 § 1237(b)(4)(B), as amended by Pub. L. No. 106-398 § 1233 and Pub. L. No. 108-375 § 1222. The statutory provision also defines "People's Liberation Army" as "the land, naval, and air military services, the police, and the intelligence services of the Communist Government of the People's Republic of China, and any member of any such service or of such police." *Id.* at § 1237(c).

On June 24, 2020, the Department of Defense designated twenty companies as CCMCs. The agency listed fifteen additional companies pursuant to Section 1237 on August 28, 2020, and December 3, 2020. And on January 14, 2021, DoD made its most recent listing, which included Plaintiff Xiaomi.

### D.      Executive Order No. 13959, as Amended

On November 12, 2020, the President declared a national emergency under IEEPA addressing the threat posed by securities investments in the United States by companies linked to the military of the People's Republic of China. *See* E.O. 13959. The President explained that the PRC "is increasingly exploiting United States capital to resource and to enable the development and modernization of its military, intelligence, and other security apparatuses, which continues to allow the PRC to directly threaten the United States homeland and United States forces

overseas[.]"  *Id*.  "Through the national strategy of Military-Civil Fusion, the PRC increases the size of the country's military-industrial complex by compelling civilian Chinese companies to support its military and intelligence activities."  *Id.*  To support these efforts, "[t]hose companies raise capital by selling securities to United States investors that trade on public exchanges both here and abroad, . . . [and] the PRC exploits United States investors to finance the development and modernization of its military."  *Id.*

By issuing E.O. 13959, the President prohibited any United States person from engaging in certain investment activities with any CCMC.  In particular, Section 1(a)(i) of E.O. 13959 prohibited U.S. persons from engaging in any "transaction in publicly traded securities, or any securities that are derivative of, or are designed to provide investment exposure to such securities, of any Communist Chinese military company as defined in section 4(a)(i) [of the E.O.]."  Further, Section 1(a)(ii) of E.O. 13959 prohibited U.S. persons from engaging in the same conduct within 60 days of a later determination that an entity satisfies the definition of Communist Chinese military company, as defined in E.O. 13959.  Notwithstanding these prohibitions, Sections 1(b) and 1(c) permitted U.S. persons to engage in purchases for value or sales for 365 days after the issuance of E.O. 13959 or the date on which the entity met the definition of a CCMC.

Section 4(a) of E.O. 13959 defines the term "Communist Chinese military company." Pursuant to Section 4(a)(i), the term includes "any person that the Secretary of Defense has listed as a Communist Chinese military company operating directly or indirectly in the United States or in any of its territories or possessions pursuant to [S]ection 1237 . . . as of the date of this order, and as set forth in the Annex to this order . . . ."  Further, under Section 4(a)(ii), as amended, the definition includes any person subsequently determined by the Secretary of Defense, in consultation with the Secretary of the Treasury, to be a "Communist Chinese military company

meeting the criteria in [S]ection 1237(b)(4)(B) . . . and that operates directly or indirectly in the United States or in any of its territories or possessions."

On January 13, 2021, the President issued Executive Order No. 13974, 86 Fed. Reg. 4875 (Jan. 19, 2021), which, in addition to certain technical edits, amended E.O. 13959 to (1) expressly require U.S. persons to fully divest the covered securities of a CCMC within 365 days of that CCMC's public listing; (2) expand the definition of "transaction" to include "sales," in addition to "purchases for value"; and (3) make clear that the definition of CCMCs set out by Section 1237 applied even after the separate Congressional reporting provision of that NDAA no longer had effect.

## III.   Factual Background and Procedural History

On January 14, 2021, the Department of Defense submitted a Section 1237 list to Congress identifying Xiaomi as a CCMC.  *See* "Qualifying Entities Prepared in Response to Section 1237 of the National Defense Authorization Act for Fiscal Year 1999 (PUBLIC LAW 105-261)."[6] As a consequence, the prohibitions set forth in E.O. 13959 will take effect with respect to Xiaomi on March 15, 2021.  *See* E.O. 13959, § 1(a)(ii).

Plaintiff Xiaomi filed this lawsuit on January 29, 2021, and amended it on February 5, 2021, adding three individuals as plaintiffs.  *See* First Amended Complaint ("Am. Compl."), ECF No. 9.  According to the First Amended Complaint, Plaintiff Xiaomi is a Chinese company headquartered in China and incorporated in the Cayman Islands.  *Id.* at ¶ 15.  Plaintiff Xiaomi "provides consumer electronic products for civilian and commercial use, including smartphones, televisions, and laptops."  *Id.*  Plaintiff Xiaomi alleges that it has two U.S subsidiaries, as well as

---

[6] https://media.defense.gov/2021/Jan/14/2002565154/-1/-1/0/DOD-RELEASES-LIST-OF-ADDITIONAL-COMPANIES-IN-ACCORDANCE-WITH-SECTION-1237-OF-FY99-NDAA.PDF.

an office in California, and that the company generated more than $300 million in revenue in the United States over the past five years.  *Id.* at ¶ 28.  Plaintiff Xiaomi also claims that its top ten shareholders are U.S. investors.  *Id.* at ¶ 29.  The First Amended Complaint alleges that Plaintiff Bin Lin is a United States citizen and one of the co-founders of Plaintiff Xiaomi.  *Id.* at ¶ 16. Plaintiffs assert that Plaintiff Bin Lin currently serves as Deputy Chairman of the Board of the company; he beneficially owns more than 400 million Class A shares and more than 1.9 billion Class B shares of Plaintiff Xiaomi.  *Id.*  The First Amended Complaint alleges that Plaintiff Peng Lin is a United States citizen and an employee of a U.S. subsidiary of Plaintiff Xiaomi.  *Id.* at ¶ 17. Plaintiffs claim that Plaintiff Peng Lin has been a beneficiary of the Xiaomi Corporation employee benefit plan, "which regularly awards employees Xiaomi stock options and restricted stock units [], and grants of Xiaomi Class B shares."  *Id.*  The First Amended Complaint similarly asserts that Plaintiff Stephen Sean English is a United States citizen and an employee of a U.S. subsidiary of Xiaomi Corporation, and that he too takes part in the Xiaomi employee benefit plan that "regularly awards" stock options and restricted stock units to its employees.  *Id.* at ¶ 18.

The First Amended Complaint asserts five claims.  Am. Compl. at ¶¶ 16-18, 55-84.  First, Plaintiffs allege that Defendants violated the APA by arbitrarily and capriciously designating Plaintiff Xiaomi.  *Id*. at ¶¶ 55-61.  Plaintiffs contend that the Department of Defense acted arbitrarily because it could not have any accurate evidence that Plaintiff Xiaomi satisfied the definition of a CCMC, and it "failed to articulate a reasonable explanation for their decision."  *Id.* at ¶ 60.  Second, Plaintiffs assert that Defendants violated the APA "[t]o the extent that the Department of Defense failed to comply" with the requirement in Section 1237 that it consult with the Attorney General, the Director of the Central Intelligence Agency, and the Director of the Federal Bureau of Investigation prior to listing Plaintiff Xiaomi.  *Id.* at ¶¶ 62-68.  Third, Plaintiffs

allege that the Department of Defense's listing of Plaintiff Xiaomi is ultra vires "both because Xiaomi fails to qualify for such agency designation under the criteria of Section 1237 and because the Defense Department did not consult with the other agencies" as required by Section 1237. *Id.* at ¶¶ 69-72.  Fourth, Plaintiffs contend that the prohibitions in E.O. 13959 as applied to Plaintiff Xiaomi will be ultra vires because the corporation does not meet the definition of a CCMC in Section 1237. *Id.* at ¶¶ 73-76.  Fifth, Plaintiffs assert that Defendants' designation of Xioami as a CCMC without notice or opportunity to be heard has deprived Plaintiffs of a property and liberty interest without due process in violation of the Fifth Amendment of the U.S. Constitution. *Id.* at ¶¶ 77-84.  Plaintiffs specifically argue that the prohibitions set forth in E.O. 13959, among other things, limit Plaintiff Xiaomi's "rights to access U.S. capital markets, its contractual relationships with shareholders, financial institutions, and other members of the public[.]" *Id.* at ¶ 80.  Plaintiffs also contend that the prohibitions in E.O. 13959 deny the individual plaintiffs "their ability to transact in or possess Xiaomi securities." *Id.* at ¶ 81.  Plaintiffs argue that they did not receive any notice prior to Plaintiff Xiaomi's listing, and they have neither been provided the factual basis for the listing nor afforded a process by which Plaintiff Xiaomi can challenge the listing. *Id.* at ¶ 82.

Plaintiffs filed a motion for preliminary injunction on February 17, 2021, arguing they were likely to succeed on the merits of their APA and due process claims. *See generally* Mem. Supp. Pls.' Mot. for Prelim. Inj. ("Pls.' Mem."), ECF No. 14-1.

## STANDARD OF REVIEW

"The standard for issuance of the extraordinary and drastic remedy of a temporary restraining order or a preliminary injunction is very high." *Jack's Canoes & Kayaks, LLC v. Nat'l Park Serv.*, 933 F. Supp. 2d 58, 75 (D.D.C. 2013) (citation omitted).  An interim injunction is "never awarded as of right," *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), and

"should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion," *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004).   A party moving for a preliminary injunction "must demonstrate '(1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction is not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction.'" *Jack's Canoes*, 933 F. Supp. 2d at 75-76 (quoting *CityFed Fin. Corp. v. Off. of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)).   When, as here, the Government is opposing a motion for a preliminary injunction, the third and fourth factors merge.  *See Nken v. Holder*, 556 U.S. 418, 435 (2009).[7]

## ARGUMENT

Plaintiffs are not entitled to the "extraordinary remedy" of preliminary injunctive relief. *Winter*, 555 U.S. at 22.  To begin, they have not demonstrated that they are likely to succeed on their claims.  With respect to their APA claim, Defendants are entitled to significant deference regarding DoD's listing determination which, in any event, is rational and rooted in evidence that Xiaomi is affiliated with the Chinese military and defense establishment.  Nor have Defendants violated the Constitution's Due Process Clause.  Xiaomi cannot show that it has a liberty interest in offering securities on the open-market, or in choosing who may possess such publicly-traded securities.  The individual plaintiffs have not established a property right to possessing *future*

---

[7] "The D.C. Circuit has, in the past, followed the 'sliding scale' approach to evaluating preliminary injunctions . . . .  The continued viability of the sliding scale approach is highly questionable, however, in light of the Supreme Court's holding in *Winter v. National Resources Defense Council*, 555 U.S. 7, 22 (2008)."  *Singh v. Carter*, 185 F. Supp. 3d 11, 16 (D.D.C. 2016) (citing *In re Navy Chaplaincy*, 738 F.3d 425, 428 (D.C. Cir. 2013), for the proposition that all four prongs of the preliminary injunction standard must be met before injunctive relief can be granted). In any event, regardless of which standard is applied, preliminary injunctive relief is inappropriate here.

Xiaomi securities, something they will no longer be able to do after March 15; at best, they have a property interest in their current shares, but they need not sell those shares until next year, and thus any injury would not be imminent as is required for preliminary relief. Nor is any harm irreparable—rather, it is largely economic or speculative. Plaintiffs have failed to show that the designation here has caused—or will cause—the company extreme hardship or threaten the existence of the company. Finally, the public interest supports the President's ability to take steps to mitigate a national emergency, as Defendants have done here.

## I.     Plaintiffs Are Not Likely To Succeed on Their Administrative Procedure Act Claims.

When evaluating claims brought pursuant to the APA, a court reviews an agency decision based on the administrative record. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971)). As relevant here, a court should uphold an agency decision unless it is, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). Under this deferential standard, the agency's decision is presumed valid, and a court reviews only whether that decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park*, 401 U.S. at 416. An agency's decision may be deemed arbitrary and capricious only in circumstances where the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or its decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Court may not "substitute its judgment for that of the agency." *Id*. Rather, the agency's decision should be affirmed as long

13

as it is supported by a rational basis.  *Id.*; *see also Zevallos v. Obama* 10 F. Supp. 3d 111, 118-19 (D.D.C. 2014).

This deference is further heightened in cases, such as this one, that involve national security and foreign affairs.  *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 734 (D.C. Cir. 2007) ("[O]ur review—in an area at the intersection of national security, foreign policy, and administrative law—is extremely deferential.").  The Supreme Court has emphasized the need for courts to grant this heightened deference even when considering constitutional claims.  *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33-34 (2010).  Cases involving sanctions are no exception. *Zevallos*, 10 F. Supp. 3d at 119 (recognizing additional deference beyond that typically accorded to an agency under the APA); *Zarmach Oil Servs., Inc. v. U.S. Dep't of the Treasury*, 750 F. Supp. 2d 150, 155 (D.D.C. 2010) ("[C]ourts owe a substantial measure of 'deference to the political branches in matters of foreign policy,' including cases involving blocking orders." (citation omitted)); *Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 84 (D.D.C. 2002) ("Blocking orders are an important component of U.S. foreign policy, and the President's choice of this tool to combat terrorism is entitled to particular deference.") , *aff'd*, 333 F.3d 156 (D.C. Cir. 2003).

In assessing that Xiaomi meets Section 1237's statutory criteria, DoD considered multiple facts about the company in light of the PRC's pursuit of the Military-Civil Fusion concept. "Military-Civil Fusion," as defined by the U.S. Department of State, "is an aggressive, national strategy of the Chinese Communist Party (CCP). . . . [whose] goal is to enable the PRC to develop the most technologically advanced military in the world."  *See Military-Civil Fusion and the People's Republic of China*, U.S. Department of State ("State Dep't. MCF").[8]  "[A] key part of

_____

[8] https://www.state.gov/wp-content/uploads/2020/05/What-is-MCF-One-Pager.pdf.

[Military-Civil Fusion] is the elimination of barriers between China's civilian research and commercial sectors, and its military and defense industrial sectors." *Id.* "[I]n practice, [Military-Civil Fusion] means that there is not a clear line between the PRC's civilian and military economies." 2020 DoD Annual Rep. at vi. This strategy involves "fusing . . . China's defense industrial base and its civilian technology and industrial base." *Id.* at 18. China's Military-Civil Fusion strategy contributed directly to the national emergency declared in E.O. 13959. *See* E.O. 13959 ("Through the national strategy of Military-Civil Fusion, the PRC increases the size of the country's military-industrial complex by compelling civilian Chinese companies to support its military and intelligence activities.").[9]

Xiaomi—as it acknowledges in its 2019 Annual Report—is investing heavily in 5th generation telecommunications capabilities (5G) and Artificial Intelligence (AI). Decl. of Andrew J. Pahutski ("Pahutski Decl."), Ex. A, at 1. Both of these technologies are of key interest to the PRC, and are a focus of the Military-Civil Fusion strategy. *See* U.S. China Comm'n 2018 Rpt. ("One key focus of the Military-Civil Fusion strategy is on Artificial Intelligence (AI)."); State Dep't. MCF ("Key technologies being targeted under MCF include . . . 5G . . . and AI. The PRC specifically seeks to exploit the inherent 'dual-use' nature of many of these technologies, which have both military and civilian applications."). Moreover, DoD found—as Xiaomi acknowledged in its 2019 Annual Report—that Xiaomi's founder and CEO, Lei Jun, was awarded the title of "Outstanding Builder[] of Socialism with Chinese Characteristics" by the Chinese Ministry of

---

[9] For the purposes of this opposition, Defendants are not claiming that these specific materials, other than the memorandum attached as Exhibit A to the Pahutski Declaration, went before the decision-maker. *See generally* Pahutski Decl. The D.C. Circuit has, however, accepted extra-record materials, if, as here, "background information was needed 'to determine whether the agency considered all the relevant factors.'" *City of Dania Beach v. FAA*, 628 F.3d 581, 590 (D.C. Cir. 2010) (quoting *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008)).

Industry and Information Technology," which is a PRC organization that "helps manage military-civil fusion for the state."  Pahutski Decl., Ex. A., at 1.  The combination of these factors—(1) active engagement and investment by Xiaomi in technologies core to the PRC's Military-Civil Fusion strategy; and (2) the connection between Xiaomi's founder, largest shareholder, Chairman, and CEO with the PRC ministry that helps manage Military-Civil Fusion—when considered in the context of the Military-Civil Fusion strategy itself, which eliminates barriers between the commercial and defense sectors, especially with regards to the technologies at issue here (5G and AI), are adequate to support DoD's finding that Xiaomi is "affiliated with the [PLA], government ministries of the [PRC], or . . . the PRC defense industrial base."  Pahutski Decl., Ex. A, at 1.

Plaintiffs contest DoD's finding on the basis of an unreasonably narrow construction of Section 1237's scope, specifically its use of the term "affiliated with" the referenced Chinese entities.  Plaintiffs' preferred definition—that "affiliated with" is limited to business relations akin to ownership or control—lacks foundation in the statute.  *See* Pls.' Mem. at 25–26.  The term's ordinary definition readily encompasses associations "on the basis of a common purpose or of shared characteristics."  *See* OED, affiliated (adj.);[10] *see also* Merriam-Webster, affiliated (adj.) ("closely associated with another typically in a dependent or subordinate position").[11]  Indeed, Plaintiffs' preferred construction would render "affiliated" largely superfluous to the statute's separate criteria concerning ownership and control.  Further, Plaintiffs' proffered definition would fail to address the threat posed by Military-Civil Fusion that Congress was attempting to address because, under that construction, as long as a ministry of the PRC government did not directly assert financial ownership over a civil corporation, the corporation would be immune from

---

[10] https://www.oed.com/view/Entry/3404?rskey=CNrhfW&result=2&isAdvanced=false#eid.

[11] https://www.merriam-webster.com/dictionary/affiliated#learn-more.

sanction, regardless of its level of cooperation with the PRC military.  That outcome was clearly not the intent of Congress when it chose to use the term "or affiliated with" in addition to "owned or controlled."

In sum, DoD's decision satisfies the highly deferential APA standard that the Court must apply here.  *See Zevallos*, 10 F. Supp. 3d at 123 n.9 (explaining that a court must uphold agency's sanctions-related decision if "the evidence OFAC relied upon as a whole 'adequately supports its ultimate decision'" (citation omitted)); *Holy Land Found.*, 219 F. Supp. 2d at 74 (decision must be affirmed if it "meets the 'minimal standards of rationality'") (quoting *Small Refin. Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 521 (D.C. Cir. 1983)).  DoD's listing decision was rational and supported by substantial evidence.[12]

Plaintiffs also fault DoD for failing to adequately explain its decision.   *See* Pls.' Mem. at 18–21.  But DoD has provided a contemporaneous explanation for its decision.  *See* Pahtuski Decl., Ex. A.  To the extent that Plaintiffs' argument is that an agency must produce an administrative record or detailed description of the basis for decision at the time a listing is made, no such rule exists under the APA.  Here, Defendants have provided evidence considered by the decision-maker in listing Xiaomi as a CCMC.  There is no APA violation in a process that involves the subsequent disclosure of a rationale created contemporaneously with an agency action.  *Cf.* LCvR 7(n) (requiring agencies to file certified copy of the administrative record within 30 days of the service of the answer or simultaneously with the filing of a dispositive motion).

Even if this Court disagreed and found error in the absence of a contemporaneously *released* explanation from the agency, such error was not prejudicial, in light of the fact that the

---

[12] At a minimum, Plaintiffs' APA claim against the President is not likely to succeed, since the President's actions are not subject to the APA.  *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992).

basis for DoD's decision has now been released.  *See* 5 U.S.C. § 706 (requiring courts reviewing agency action to take "due account . . . of the rule of prejudicial error.").  Given the totality of evidence before the agency, any such error would be harmless and therefore insufficient to warrant the relief Xiaomi seeks.  As discussed, the President's Executive Order demonstrated the pivotal national security importance of combating Chinese Military-Civil Fusion, *see* E.O. 13959, and DoD found Xiaomi was a CCMC in light of evidence indicating the company's role in that fusion, Pahtuski Decl., Ex A..  The deferential standards of the APA in the national security context require no more.  *See Zevallos*, 10 F. Supp. 3d at 123 n.9; *Holy Land Found.*, 219 F. Supp. 2d at 74.

## II.    **Plaintiffs Are Not Likely To Succeed on Their Due Process Claim.**

The Due Process Clause of the Fifth Amendment provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.  The Due Process Clause attaches to U.S. persons and to aliens who have "entered the territory of the United States and established substantial connections with this country."  *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 203 (D.C. Cir. 2001).  Solely for the purposes of this opposition, Defendants assume, arguendo, that Plaintiffs satisfy these requirements.  *See* Pls.' Mem. at 27.  The next inquiry "is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'"  *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 315 (D.C. Cir. 2014) (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999)).  If plaintiffs have been deprived of a protected interest, the Court must determine "whether the procedures used by the Government in effecting the deprivation 'comport with due process.'"  *Id.* (quoting *Am. Mfrs. Mut. Ins. Co.*, 526 U.S. at 59).

Plaintiffs, however, have failed to show that they have been deprived of a protected liberty or property interest sufficient to entitle them to the extraordinary remedy of preliminary injunctive

relief.  In determining whether an interest protectable under the Due Process Clause attaches at all, it is important to consider the different interests articulated by the different types of plaintiffs (Xiaomi itself versus the individual plaintiffs) and those implicated by different trigger dates (the March 15, 2021 effective date of the prohibition on U.S. persons engaging in transactions in certain publicly traded Xiaomi securities, and the January 14, 2022 deadline for U.S. persons to divest any Xiaomi securities they had previously purchased).  Plaintiffs claim the following property or liberty interests in their brief.  *See* Pls.' Mem. at 29-30.

|  | March 15, 2021 Trigger Date | January 14, 2022 Trigger Date |
|---|---|---|
| Xiaomi | • Deprived of right to offer securities to U.S. persons and/or form future contracts with U.S. persons.<br>• Damage to international reputation and professional goodwill. | • Deprived of its existing contractual relationships with U.S. shareholders and financial institutions. |
| Individual Plaintiffs | • Prohibited from purchasing additional Xiaomi securities. | • Deadline for divestment of existing holdings of Xiaomi securities. |

The initial set of purported protectable interests involve restrictions that are implicated as of March 15, 2021.

*First,* Xiaomi claims a liberty interest to "offer Securities to U.S. persons and to access U.S. capital markets," as well a right to "form future contracts [with U.S. persons.]"  Pls.' Mem. at 28.  (Because E.O. 13959 only prohibits U.S. persons from engaging in "transactions in publicly traded securities, or any securities that are derivatives of, or are designed to provide investment exposure to such securities," E.O. 13959 § 1(a)(i), rather than prohibiting contracts generally with U.S. persons, the reference to "future contracts" appears to simply be a reference to transacting publicly traded securities with U.S. persons.)

But Xiaomi points to no case establishing it has a constitutionally protected liberty interest in having U.S. persons transact in its publicly-traded securities. To the extent Xiaomi claims a liberty interest, its argument appears to sound in the right to operate its chosen business as it sees fit, *i.e.*, to transact securities with whomever it wants. This argument is best understood as a claim that Xiaomi's "right to . . . follow a chosen profession free from unreasonable interference," which "comes within the 'liberty . . . concept of the Fifth Amendment," is being hindered. *Trifax Corp. v. District of Columbia*, 314 F.3d 641, 643 (D.C. Cir. 2003) (quoting *Greene v. McElroy*, 360 U.S. 474, 492 (1959)); *see also Kartseva v. Dep't of State*, 37 F.3d 1524, 1529 (D.C. Cir. 1994) (acknowledging a "constitutionally protected right to follow a chosen trade or profession."). In order to establish such a violation, plaintiffs must show that "the government has seriously affected, if not destroyed, their ability to obtain employment or contracts in their field."[13] *Trifax Corp.*, 314 F.3d at 644 (quoting *Taylor v. Resol. Tr. Corp.*, 56 F.3d 1497, 1506 (D.C. Cir. 1995)) (alterations omitted); *see also Jackson v. Heh*, 215 F.3d 1326 (Table), *6 (6th Cir. 2000) ("Indeed, it is only where the defendant's actions effectively precludes the plaintiff from practicing his trade with *all* employers or customers that the plaintiff's liberty interest in pursuing his occupation is infringed.") (emphasis added) (collecting cases); *Capogrosso v. Gelbstein*, 18-cv-2710 (MKB)(LB), 2019 WL 6406444, at *11 (E.D.N.Y. Jan. 30, 2019) ("It is well settled that one must have no ability to practice one's profession at all in order to state a claim for deprivation of a liberty interest.") (quoting *Rodriguez v. Margotta*, 71 F. Supp. 2d 289, 296 (S.D.N.Y. 1999).

---

[13] The D.C. Circuit has recognized that "formally debarring a corporation from government contract bidding constitutes a deprivation of liberty that triggers the procedural guarantees of the Due Process Clause." *Trifax*, 314 F.3d at 643. Here, however, there has been no formal debarring from government contracts, and so the "effectively precludes" doctrine is more appropriate in this context.

Xiaomi never claims such total preclusion. Nor can it. The challenged listing does not restrict Xiaomi's ability to sell its products in the United States or to U.S. persons. Given that Plaintiffs themselves characterize Xiaomi as a consumer and commercial electronics company, it cannot be reasonably said that this listing destroys its ability to pursue that field. Even if Xiaomi could claim a narrower liberty interest in not being precluded from the sale of securities, it would again fail to show a total preclusion. Xiaomi remains free to issue publicly traded securities on the open market, which may be purchased by all but U.S. persons. While there is, to be sure, a limitation on *who* may purchase such securities, the company's ability to transact in such publicly-traded securities has certainly not been "destroyed."[14] *See, e.g.*, *Capogrosso*, 2019 WL 60644 at *11 (lawyer barred from representing clients before particular administrative tribunal does not have a liberty interest)

Accordingly, Xiaomi has not established that it has a constitutionally secured liberty interest in transacting publicly traded securities with U.S. persons after March 15.

***Second***, with respect to the March 15 deadline, the individual plaintiffs claim that they will "be prohibited from purchasing more Xiaomi Securities" after that date. Pls.' Mem. at 28-29. But these plaintiffs have not shown that they have a property right in the *future* purchase of securities. "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). At best,

---

[14] Xiaomi also posits that its liberty interest in its "international reputation and professional goodwill" has been threatened. *See* Pls.' Mem. at 28 & n.13. Reputational injury is evaluated under the "stigma-plus" or "reputation plus" requirement, which similarly requires the plaintiff to show that the government "has seriously affected, if not destroyed, their ability to obtain employment or contracts in their field." *Trifax*, 314 F.3d at 644. Again, Xiaomi cannot meet this standard.

these plaintiffs have a "unilateral expectation" that they will be able to purchase such publicly traded securities, but not a specific property right guaranteeing that they can do so.[15]  As a result, this provision of E.O. 13959 does not implicate their constitutionally protected property interests.

**Third,** Xiaomi claims that it will be deprived of its "existing contractual relationships with U.S. shareholders and financial institutions" once those entities are required to divest their publicly-traded securities as of January 14, 2022. Pls.' Mem. at 28.  But these relationships involve *publicly-traded securities*, where any contractual rights would be between Xiaomi and whomever the holder of that security happened to be.  Xiaomi does not advance an argument that it has a liberty interest in choosing the identity of the holder of a publicly-traded security, and it certainly cites no case law establishing such an interest.  Indeed, this would be an anomalous result: would, for example, Amazon have a due process right to notice and an opportunity to be heard if a Bankruptcy Court ordered a debtor to sell its security in order to pay a creditor?  Almost certainly not—and yet that, in effect, is the result that Xiaomi would require in this case.  As such, Xiaomi can claim no due process interests that will be implicated as of January 14, 2022, and thus was entitled to no process.

**Finally**, the individual plaintiffs claim that they have property interests that will be implicated when they are required to sell their publicly-traded securities by January 14, 2022. Pls.' Mem. at 29.  Defendants acknowledge that these plaintiffs have such property interests.  However, because such interests will not be implicated until 2022, there is no immediate injury that would

---

[15] Plaintiffs Peng Lin and Stephen Sean English state that they are "beneficiaries of the Xiaomi Corporation employee benefit plan, which regularly awards employees Xiaomi stock options and restricted stock units," and that "[a]s of March 15, 2021, however, they will no longer be permitted to receive awards of Xiaomi stock." Pls.' Mem. at 41.  These plaintiffs, however, do not establish facts showing that they have a property *entitlement* to such stock options in a way that creates a constitutionally protected property right in future options.

justify a preliminary injunction.  *See, e.g.*, *Verma v. U.S. Citizenship & Immigration Serv..*, No. 20-cv-3419 (RDM), 2020 WL 7495286, at * 11 (D.D.C. Dec. 18, 2020) ("[T]he certain and *immediate* harm that a movant alleges must also be truly irreparable in the sense that it is beyond remediation.") (citing *Elec. Priv. Info. Ctr. v. U.S. Dep't of Justice*, 15 F. Supp. 3d 32, 44 (D.D.C. 2014) (internal quotation marks omitted and emphasis added).  The purpose of a preliminary injunction is to maintain the status quo pending a decision on the merits and Plaintiffs have failed to show that this APA matter could not be decided well before January 2022 or even that the issues in question could not be remanded to the agency well before that date.  And even if this Court disagrees, Defendants respectfully submit that any injunction should be limited solely to current holders of Xiaomi securities, and solely to the obligation to divest by January 14.  *See, e.g.*, *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (injunctive relief may "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs" in that case).[16]

### III.   Plaintiffs Have Not Established Certain, Imminent Irreparable Harm Justifying a Preliminary Injunction

"[T]he basis of injunctive relief in the federal courts has always been irreparable harm." *CityFed Fin. Corp.*, 58 F.3d at 747 (quoting *Sampson v. Murray*, 415 U.S. 61, 88 (1974)).  The harm must be "certain and great, actual and not theoretical, and so imminent that there is a clear and present need for equitable relief to prevent irreparable harm."  *League of Women Voters v. Newby*, 838 F.3d 1, 7-8 (D.C. Cir. 2016) (citation and alteration omitted).

Plaintiffs have the burden to put forth sufficient evidence to satisfy this high standard.  "The movant cannot simply make 'broad conclusory statements' about the existence of harm.  Rather,

---

[16] Solely for the purposes of this opposition, Defendants do not contest that *if* Plaintiffs have been deprived of a protected interest, the procedures used by DoD do not comport with due process.  *See* Pls.' Mem. at 29-33.  In any event, as explained above, Plaintiffs cannot establish imminent, irreparable harm.

[the movant] must 'submit[ ] . . . competent evidence into the record . . . that would permit the Court to assess whether [the movant], in fact, faces irreparable harm . . . .'" *Aviles-Wynkoop v. Neal*, 978 F. Supp. 2d 15, 21 (D.D.C. 2013) (quoting *Cornish v. Dudas*, 540 F. Supp. 2d 61, 65 (D.D.C. 2008)).

Many of the purported harms Plaintiff Xiaomi identifies constitute nothing more than theoretical outcomes, not certain and great injury. For example, Plaintiffs allege that Xiaomi will face a diminished market share of the consumer electronics industry absent a preliminary injunction. *See* Pls.' Mem. at 37. Yet Plaintiffs base this claim on the mere assumption that if they stop making "strategic acquisitions, competitors not subject to the [r]estrictions are *more than likely* to step up and take its place." *Id.* (emphasis added). *See Mead Johnson Pharm. Grp. v. Bowen*, 655 F. Supp.53, 53-56 (D.D.C. 1986) (rejecting as "pure speculation" a pharmaceutical company's claim in support of its preliminary injunction motion that it would suffer loss of sales if a competing generic drug were approved and marketed), *aff'd*, 838 F.2d 1332 (D.C. Cir. 1988). Plaintiffs also assert that absent a preliminary injunction, the "[r]estrictions will largely cut off Xiaomi's access to new investment from U.S. capital markets." *See* Pls.' Mem at 36-37. Plaintiffs, however, do not explain why Xiaomi cannot obtain capital from other sources that do not implicate the sanctions imposed by E.O. 13959, *i.e.*, all of the world's non-U.S. person investors. *See Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) ("Bare allegations of what is likely to occur are of no value since the court must decide whether the harm will in fact occur."). Similarly, Plaintiffs hypothesize that Xiaomi will face difficulty recruiting and retaining professional talent with the requisite technological skillset. *See* Pls.' Mem. at 38-39. This speculative assertion fails to establish how a preliminary injunction—as opposed to a decision on the merits—will improve the hiring and retention of personnel. Instead, Plaintiffs note that two potential "senior recruits"

decided not to join the company because of its listing.  *Id.* at 38.  But Plaintiffs acknowledge in the Complaint that Xiaomi is a Fortune 500 company with market capitalization of approximately $96.8 billion.  *See* Am. Compl. ¶ 26.  Plaintiffs do not explain, nor can they, how the alleged loss of two possible recruits in a company the size and scope of Xiaomi justifies a preliminary injunction.

Plaintiff Xiaomi's claim of irreparable harm has another fundamental flaw.  *See* Pls.' Mem. at 36-40.  Plaintiff Xiaomi alleges that it will endure economic harm, variously described as a loss of access to U.S. capital, diminished market share, difficulty recruiting and maintaining talent, and unrecoverable monetary loss.  *Id.*  But such harm only rises to the level of irreparable "where the loss threatens the very existence of the movant's business."[17]  *Wis. Gas Co.*, 758 F.2d at 674.  "The universe of harms that meet this litmus test is narrow indeed."  *Econ. Rsch. Servs., Inc. v. Resolution Econ., LLC*, 140 F. Supp. 3d 47, 53 (D.D.C. 2015).  Indeed, "even where the United States is the defendant, 'a plaintiff must establish that the economic harm is so severe as to cause extreme hardship to the business.'"  *Cal. Ass'n of Priv. Postsecondary Schs. v. DeVos*, 344 F. Supp. 3d 158, 171 (D.D.C. 2018) (quoting *Coal. for Common Sense in Gov't Procurement v. United States*, 576 F. Supp. 2d 162, 168 (D.D.C. 2008)).

---

[17]   Without further development, Plaintiffs argue that this "rule does not hold true when economic losses are unrecoverable, such as when—as here—sovereign immunity bars claims for damages." Pls.' Mem. at 39.  Courts in this district have rejected this premise, noting that "not only is such a rule not the law of this Circuit, but it would also effectively eliminate the irreparable harm requirement." *Air Transport Ass'n  of Am., Inc. v. Export-Import Bank of the U.S.*, 840 F. Supp. 2d 327, 335 (D.D.C. 2012); *see also Figg Bridge Eng'rs, Inc. v. Fed. Highway Admin.*, No. 20-cv-2188 (CKK), 2020 WL 4784722, at *8 (D.D.C. Aug. 17, 2020) (same).  Rather, regardless of sovereign immunity, Plaintiffs must establish "certain, great and actual" losses.  *See Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 52-53 (D.D.C. 2011); *see also Air Transport Ass'n*, 840 F. Supp. 2d at 336 (stating, in a challenge against an entity where sovereign immunity barred damages, that "[e]conomic harm may constitute irreparable injury, however, when 'the loss threatens the very existence of the movant's business.'") (quoting *Wis. Gas*, 758 F.2d at 674).

Plaintiff Xiaomi has not put forth sufficient evidence that the actions undertaken by the Government threaten its "very existence," *Wis. Gas Co.*, 758 F.2d at 674, or "cause extreme hardship to the business," *Cal. Ass'n of Priv. Postsecondary Schs.*, 344 F. Supp. 3d at 171.  Indeed, the representations made by Plaintiff Xiaomi in the Amended Complaint and in the opening brief paint a very different picture: (1) Xiaomi had a market capitalization of $96 billion as of February 21, 2021, one month after its listing, Pls.' Mem. at 4, n.4; (2) Xiaomi is now the third-largest smartphone manufacturer in the world, *id.* at 4; (3) Xiaomi's offerings are diverse and expanding, *id.* at 5; (4) Xiaomi has experienced robust growth with total revenue of approximately $29.5 billion in 2019 and $25.7 billion through the end of the third quarter of 2020, Am. Compl. ¶ 26; and (5) Xiaomi became the youngest company to reach the Fortune 500 list, *id.*  Thus, Xiaomi appears to be a rapidly expanding business with vast assets, not one whose existence is being threatened in a manner that would warrant a preliminary injunction while the company pursues this lawsuit.

The irreparable harm arguments presented by the individual plaintiffs fare no better. Plaintiff Bin Lin notes that he will be forced to sell billions of dollars of publicly traded Xiaomi stock.  *See* Pls' Mem. at 40.  While he has accurately described his future obligations, Plaintiff Bin Lin has not explained why he will suffer irreparable harm without a preliminary injunction *now* in light of the fact that he does not need to divest the stock until January 2022.  *See* E.O. 13974, § 1; *see also Wis. Gas. Co.*, 758 F.2d at 674 ("[T]he party seeking injunctive relief must show that the injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm.") (citation, quotation marks, and brackets omitted, emphasis in original).  Likewise, Plaintiff Bin Lin has not demonstrated why he will suffer irreparable harm when he can simply sell his Xiaomi stock and reinvest the proceeds in other publicly traded

securities or investment opportunities.  *See Verma*, 2020 WL 7495286, at \*11 (explaining that the alleged harm must be "truly irreparable in the sense that it is beyond remediation").  The other individual plaintiffs face similar hurdles.  Plaintiffs Peng Lin and English would also be forced to sell their publicly traded Xiaomi stock, but like Plaintiff Bin Lin, they have not shown that a preliminary injunction is warranted given that they have approximately eleven months to do so.  *See* Pls.' Mem. at 41; *Wis. Gas. Co.*, 758 F.2d at 674.  With regard to potential future stock awards, Plaintiffs Peng Lin and English cannot show likely irreparable harm because the possibility that Xiaomi will award them stock options in the future is, at best, speculative.  Further, Plaintiffs Peng Lin and English only have a contingent future interest in their unvested stock options; they can hardly argue that they will be irreparably harmed by not receiving a benefit that they never had in the first place and had no guarantee they would ever receive.  And, indeed, to the extent there is a violation, Plaintiffs have not established that Defendants could not cure any due process or APA errors, either voluntarily or on remand after a final judgment, before the January 2022 deadline, thus obviating the need for immediate relief.[18]

## IV.    The Balance of the Equities and Public Interest Strongly Favor the Government.

The public interest and balance of the equities "merge when the Government is the opposing party."  *Nken*, 556 U.S. at 435.  Neither the public interest nor the balance of equities favors Plaintiffs' request for preliminary relief.

The balance of the equities weighs strongly against the issuance of a preliminary injunction.  The Executive relies on a series of tools to effectuate the national security and foreign

---

[18]  Plaintiffs also allege that the purported denial of their due process rights constitutes ipso facto irreparable harm.  *See* Pls.' Mem. at 35.  For the reasons discussed above, Plaintiffs have not demonstrated a Fifth Amendment violation.  *See supra*.

policy of the United States.  An important tool at its disposal is the declaration of a national emergency pursuant to IEEPA, as authorized by Congress, and the initiation of economic sanctions.  *See, e.g.*, *Holy Land Found.*, 219 F. Supp. 2d at 84 ("Blocking orders are an important component of U.S. foreign policy, and the President's choice of this tool to combat terrorism is entitled to particular deference.").  Here, for example, both Congress and the President have acknowledged the threat posed by companies linked to the military of the PRC.  *See* FY99 NDAA § 1237; FY21 NDAA § 1260H; E.O. 13959.  Indeed, the President explained that the PRC "is increasingly exploiting United States capital to resource and to enable the development and modernization of its military, intelligence, and other security apparatuses, which continues to allow the PRC to directly threaten the United States homeland and United States forces overseas[.]"  *Id.* On the other side of the scale, Plaintiffs ask the Court to take the extreme measure of issuing a preliminary injunction for the sole purpose of allegedly preventing incremental economic loss to a Fortune 500 company with "market capitalization of approximately $96 billion," or to minimize potential loss to that company's U.S. investors.  Pls.' Mem. at 4.  The equities favor the security and prosperity of the United States over the wealth of one particular corporation and its investors.

Further, the public has an interest in a robust, comprehensive, and varied approach to national security and foreign policy, including, when appropriate, the application of economic sanctions.  By invoking IEEPA and declaring a national emergency, the Executive determined that Plaintiff Xiaomi poses a national security threat to the United States and its citizens.  *See* E.O. 13959.  Plaintiffs would be hard-pressed to argue that the public interest lies with the financial prosperity of a corporation worth nearly $100 billion or of certain investors, rather than the security of the country's citizenry.  *See Winter*, 555 U.S. at 24 (acknowledging the deference owed the

Executive in the context of a preliminary injunction when the decision involves important national security considerations).

In sum, even if Plaintiffs established some amount of economic harm, the "weighty interests of national security and foreign affairs" squarely tip the balance of equities and public interest in favor of the Government.   *Humanitarian Law Project*, 561 U.S. at 33-34; *see also Def. Distributed v. Dep't of State*, 838 F.3d 451, 458-60 (5th Cir. 2016) (Government's interests in national defense and national security outweighed potential temporary infringement of plaintiffs' constitutional rights).

## <u>CONCLUSION</u>

For the aforementioned reasons, this Court should deny Plaintiffs' motion for a preliminary injunction.

Dated February 26, 2021                Respectfully submitted,

                                       BRIAN M. BOYNTON
                                       Acting Assistant Attorney General

                                       ALEXANDER K. HAAS
                                       Branch Director

                                       ANTHONY J. COPPOLINO
                                       Deputy Branch Director

                                       BRIGHAM BOWEN
                                       Assistant Branch Director

                                       */s/ Joseph E. Borson*
                                       JOSEPH E. BORSON (Va. Bar No. 85519)
                                       STEPHEN M. ELLIOTT
                                       JAMES R. POWERS
                                       Trial Attorneys
                                       U. S. Dept. of Justice
                                       Civil Division, Federal Programs Branch
                                       1100 L St., NW
                                       Washington, D.C. 20005
                                       Tel.     (202) 514-1944
                                       Email:  joseph.borson@usdoj.gov

                                       *Counsel for Defendants*